**UNITED STATES of America,
Plaintiff, Appellant,**

v.

**Orville H. DRUMM, Defendant, Appellee.**

**No. 6214.**

United States Court of Appeals
First Circuit.

March 23, 1964.

Robert V. Zener, Attorney, Department of Justice, with whom John W. Douglas, Asst. Atty. Gen., W. Arthur Garrity, Jr., U. S. Atty., and Alan S. Rosenthal, Attorney, Department of Justice, were on brief, for appellant.

Philip T. Jones, East Weymouth, Mass., with whom Edward D. Hassan, Boston, Mass., was on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal by the plaintiff-appellant, United States of America, from a judgment of the United States District Court for the District of Massachusetts, entered June 20, 1963, following a jury verdict directed by the court in favor of the defendant-appellee, Orville H. Drumm.

The government brought this civil action against defendant Drumm for an accounting of payments made to him by a private company while he was in the employ of the United States Department of Agriculture during the years 1951 through 1956. The complaint alleged that while employed as a federal poultry inspector the defendant breached a fiduciary duty which he owed the government by receiving payments as a consultant to the very processor whose operations it was his federal duty to inspect. Defendant admitted receiving payments totalling $35,022.50 from the Thorndike and Gerrish Company, two-thirds owner of Native Prepared Poultry Company and Derry Dressed Poultry Company whose poultry he was assigned to inspect, but contended that such payments were for professional services rendered the parent company "separate and apart from and in no manner connected with or in derogation of" his duties as a poultry inspector for the Department of Agriculture. He further claimed that his supervisors in the Department knew of and acquiesced in his work for Thorndike and Gerrish and in the receipt of the money paid to him for this work.

As a poultry inspector defendant was charged with the duties, among others, of inspecting the processing of poultry, ensuring that the poultry that was inspected was of sufficiently high quality to meet the standards set forth by the Department of Agriculture and ensuring that certain standards of sanitation and wholesomeness were maintained. He was required to report all violations coming to his attention. Failure of a processor to meet Department standards could mean suspension of the inspection service. Poultry inspection was voluntary at

that time but many processors sought to participate in the program because of the refusal of many large buyers to buy any but government inspected poultry. The processor was billed by the Department for the inspector's time.

Defendant's employment as a consultant to Thorndike and Gerrish began in late 1951 or early 1952. He testified that while he was inspecting poultry at the plant of the Native Prepared Poultry Company he had a number of conversations with Dan McLaughlin, an officer of Thorndike and Gerrish and, apparently, of the two poultry companies as well. In one of those conversations McLaughlin asked him whether he could "help them after hours in the processing of the finished products or any part of the products." For this "part-time" work, defendant received a salary of $85 a week plus bonuses, adding up to a five year total of over $35,000. At the time of his retirement from the federal service in 1956 defendant's annual salary as a poultry inspector was $6,250.

As part of his employment for Thorndike and Gerrish, defendant testified that he assisted the company in deciding which of the available methods of packaging should be used in the packaging of cut-up birds. He had "a great many" conferences with representatives of the A & P food chain—a major Thorndike and Gerrish customer—to instruct them how to handle chickens after delivery so as to reduce contamination. He assisted Thorndike and Gerrish in tracking down and eliminating the source of discoloration of ducks received by producers in a discolored condition. In his attempt to work out these difficulties defendant often sought help from other government employees. There was no evidence as to whether, in so doing, he ever revealed that he was acting as an employee of Thorndike and Gerrish rather than as a government inspector interested in helping the inspected plant to solve some of its problems.

Throughout the five years in question defendant, who was a veterinarian, conducted a private veterinary practice at his home in Lunenburg, Massachusetts. On May 4, 1953 he received a letter from Bernard Meeks, assistant to the Director of the Poultry Branch of the Production and Marketing Administration of the Department of Agriculture, pointing out that complaints had been received from other veterinarians in the Lunenburg area and that it was contrary to the rules of the Department to engage in outside employment without permission. The rule, which was quoted in Meeks' letter, provided in part:

> "*Outside work*—If an employee wishes to perform outside work after official hours, he should advise his supervisor who will clear all outside work with the appropriate PM office. An employee may not engage in outside work (including teaching) that might prevent efficient performance of duties as an employee of PMA or might cause an embarrassment * * *."

On October 5, 1953 defendant addressed the following letter to his supervisor:

> "Dear Dr. Harney: On May 4, 1953 I received a letter from Bernard M. Meeks of the Poultry Branch relative to my conducting private practice of Veterinary Medicine at my home in Lunenburg and I gave him a statement of facts [1] as they were but misunderstood that a formal request should have followed.
>
> "I would like permission to continue with my private practice on week ends and in my office in the evenings as I find my income from my poultry inspection work is not sufficient to meet my financial obligations.
>
> "I have one daughter, a senior, at Brown University and four younger children coming along in the grades

1. The statement of facts referred to was contained in a letter from defendant to his supervisor dated May 14, 1953 detailing the history and extent of defendant's veterinary practice.

and high school and the needs are on the increase which means all the earning power I possess is a necessity.

"If this permission is at all possible I will be very grateful for this consideration in view of the above facts. Thanking you for this consideration, I am,

"Very truly yours,

O. H. Drumm, V.M.D."

Permission was granted by means of an office memorandum from the Chief of the Eastern Area Personnel Management Division to defendant's supervisor:

"This will acknowledge receipt of a copy of Dr. O. H. Drumm's letter to you of October 5, 1953 requesting permission to continue with his private practice on weekends and in the evenings.

"This is to advise that permission has been granted Dr. Drumm to continue his private practice on weekends and in the evenings as long as it does not prevent efficient performance of his duties as an employee of CSS, Department of Agriculture."

Having established the above mentioned facts, primarily through the testimony of the defendant, the government rested its case. Defendant then moved for a directed verdict. The court granted the motion, explaining only that "it is the considered opinion of this Court that on the evidence which has been presented a prima facie case has not been made out by the complainant." We do not agree with this evaluation of the evidence.

As an employee of the Department of Agriculture, defendant was charged with the duty of determining whether certain poultry was qualified to receive the government's stamp of approval. This approval was highly prized by processors and was not lightly awarded. Detailed federal sanitary standards had to be complied with. It would not be too much to assume that the government respected the decisions of its inspectors and demanded that they be fair and impartial in their determinations. In performing his duties as a poultry inspector defendant worked five days a week, eight hours a day and received a salary as a full time government employee. While so employed by the government and assigned to pass on the adequacy of the methods and facilities of Native Prepared Poultry Company and later Derry Dressed Poultry Company, he was receiving as a part-time employee of the parent company annual payment in excess of his earnings as a federal employee. And while his public employment required him to inspect the entire processing and packaging operation of Native and Derry for compliance with federal standards, his private employment required him to advise and consult the parent company as to methods of processing and packaging.[2]

From these facts a jury could conclude that the defendant had secretly placed himself in a position of conflicting interests and loyalties. This he had no right to do. As a full time representative of the Department's inspection service, he owed a duty of fidelity to his employer. "An agent is a fiduciary with respect to the matters within the scope of his agency." Restatement (Second) Agency § 13 (1958). He could not secretly accept a second employment involving duties adverse to those he owed the government. See Searl v. Earll, 95 U.S.App.D.C. 151, 221 F.2d 24 (D.C.Cir. 1954); Phillips Petroleum Company v. Peterson, 218 F.2d 926 (10th Cir.1954), cert. denied, 349 U.S. 947, 75 S.Ct. 871, 99 L.Ed. 1273 (1955). His reliance on Thorndike and Gerrish for a salary surpassing that given him by the government and his work for Thorndike and Gerrish in advising upon the same processes he was assigned to inspect, certainly compromised to a great extent his position as an impartial poultry inspector and his usefulness to the government. A jury might well wonder whether in-

---

2. Defendant's testimony leaves little doubt that he was aware of the substantial identity of interest among the three companies.

spector Drumm was likely to condemn as unsanitary and violative of federal standards a method of packaging instituted as a result of advice given by private consultant Drumm.

■■ The fact that there is no evidence that defendant passed bad poultry or that the reputation of the government's inspection program was damaged by defendant's conduct would not bar recovery by the government if a breach of fiduciary duty be found. Walsh v. Atlantic Research Associates, 321 Mass. 57, 71 N.E.2d 580 (1947); Restatement (Second) Agency § 403 (1958). "An agent may be held accountable for all profits in excess of his lawful compensation which he acquires during the course of his agency." In re Luther, 63 F.Supp. 83, 85 (W.D.Mo.), aff'd sub nom. Theis v. Luther, 151 F.2d 397 (8th Cir.), cert. denied, 327 U.S. 781, 66 S.Ct. 681, 90 L. Ed. 1009 (1945). See Pratt v. Shell Petroleum Corporation, 100 F.2d 833 (10th Cir.), cert. denied, 306 U.S. 659, 59 S.Ct. 775, 83 L.Ed. 1056 (1939). In United States v. Carter, 217 U.S. 286, 305, 30 S.Ct. 515, 519, 54 L.Ed. 769 (1910), the Supreme Court held that the measure of recovery in an accounting action brought by the government against one of its employees who secretly received a portion of the profits made on certain government contracts falling under his supervision was the profit received by the employee rather than any damage that may have been done to the government:

"* * * It is immaterial if that appears whether the complainant was able to show any specific abuse of discretion, or whether it was able to show that it had suffered any actual loss by fraud or otherwise. It is not enough for one occupying a confidential relation to another, who is shown to have secretly received a benefit from the opposite party, to say, 'You cannot show any fraud, or you cannot show that you have sustained any loss by my conduct.' Such an agent has the power to conceal his fraud and hide the injury done

his principal. It would be a dangerous precedent to lay down as law that unless some affirmative fraud or loss can be shown, the agent may hold on to any secret benefit he may be able to make out of his agency. The larger interests of public justice will not tolerate, under any circumstances, that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with his fidelity as an agent. If he takes any gift, gratuity or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received."

■■ We think the evidence presented by the government to show that defendant's dual employment was not made known to the Department of Agriculture, while certainly not conclusive, was sufficient to create an inference of non-disclosure. On appeal from the granting of a motion for a directed verdict the evidence must be considered in the light most favorable to the party against whom the verdict was directed and that party must be given the advantage of every fair and reasonable intendment that evidence can justify. Roche v. New Hampshire Nat. Bank, 192 F.2d 203 (1st Cir.1951); Brownell v. Tide Water Associated Oil Co., 121 F.2d 239 (1st Cir. 1941). The letters introduced into evidence by the government made it clear that defendant was notified of the provisions of the rule requiring departmental consent to outside work and knowingly limited his request for consent to the private veterinary practice he conducted at his home. His letter to supervisor Harney could lead one to conclude that defendant's only source of income other than that derived from his veterinary practice was his government salary. Given this opportunity to reveal his outside work, a jury could find that the defendant chose to remain silent about his

work for Thorndike and Gerrish and that the government remained ignorant of it.

 A careful reading of the record discloses that the trial judge displayed a marked prejudice against the government. Accordingly, any new trial of this case should be held before another judge.

Judgment will be entered vacating the judgment of the District Court, setting aside the directed verdict, and remanding the case for a new trial before another judge.