(No. 51574

MULLANEY, WELLS & COMPANY, Appellant, v. BARN-
ARD A. SAVAGE, JR., *et al.*, Appellees.

*Opinion filed Feb. 1, 1980.—Rehearing denied Mar. 28, 1980.*

536

James L. Perkins and John L. Huff, of Chicago (Winston & Strawn, of counsel), for appellant.

Francis B. Stine and Robert V. Hogan, of Chicago (Quinn, Jacobs & Barry and Brown, Stine, Cook & Hanson, of counsel), for appellees Bernard A. Savage, Jr., and Glen Ellyn Corporation.

Thomas G. Poulakidas, James A. Sprowl, and Nicholas T. Kitsos, of Chicago (Poulakidas, Poulakidas & Wood, of counsel), for appellee Dorothy F. Williams.

MR. JUSTICE WARD delivered the opinion of the court:

The plaintiff, Mullaney, Wells and Company, filed an action in the circuit court of Cook County on July 3, 1963, against the defendants, Barnard A. Savage, Jr., S. C. Williams, and Glen Ellyn Corporation, seeking an accounting for profits received in connection with the disposition of stock which had been acquired through an alleged violation of fiduciary duties by the defendant Savage, who was an employee of the plaintiff at the time. The case, which was tried on the plaintiff's second amended complaint, filed September 16, 1965, was referred to a master in chancery, who recommended that a decree be entered in favor of the plaintiff. After two interlocutory appeals relating to aspects of the case which are not now pertinent (*Mullaney, Wells & Co. v. Savage*, 5 Ill. App. 3d 1 (1972); 31 Ill. App. 3d 343 (1975)), the circuit court sustained the defendants' exceptions to the master's report and entered a decree dismissing the action for want of equity. The appellate court affirmed (66 Ill. App. 3d 853), and we granted the plaintiff's petition for leave to appeal.

At the time when the material facts occurred, the plaintiff was engaged in the investment banking business in Chicago. On January 18, 1957, it employed the defendant Savage, and Savage continued in the plaintiff's employment until March 28, 1961, when he resigned.

The agreement under which Savage was engaged was drafted by him and was executed by Savage and Paul L. Mullaney, president of the plaintiff. It provided as follows:

"1. Nature of Agreement—An understanding has been reached whereby Barnard A. Savage, Jr. will become affiliated with Mullaney Wells and Co. to undertake the establishment and direction of an 'industrial financing division.' The function of this newly created division will principally focus on activities involving the origination and negotiation of private placements and the underwriting of corporate securities in the industrial field.

2. Remuneration—Six thousand dollars ($6,000) per annum, payable to Barnard A. Savage, Jr., to be deducted from divisional gross revenues at the conclusion of each calendar year.

3. Division of Net Profits—At the conclusion of each calendar year, total net profits, after deducting all operating expenses accrued by the 'industrial financing division' and after deducting the salary taken by Barnard A. Savage, Jr., will be divided on a 50-50 basis between Mullaney Wells and Co. and Barnard A. Savage, Jr.

4. Duration of Agreement—Both parties concur to appraise this agreement and make such adjustments as the facts and circumstances may warrant at the conclusion of the first year of operations. This agreement is subject to cancellation by either party at any time."

Savage was neither an officer nor a director of the plaintiff, and the precise scope of the duties imposed by his contract is in dispute among the parties.

The transaction on which the present suit is based was the acquisition by Savage and Williams in November 1960, from the majority stockholders of Blossman Hydratane Gas, Inc., a corporation engaged in the liquid petroleum gas business, of options to purchase some of the company's common stock. These options were later assigned to the defendant Glen Ellyn Corporation, a corporation controlled by Savage and Williams. After the options were exercised by Glen Ellyn, the latter assigned the Blossman stock to American Hydratane Corporation, which had been organized by Savage and Williams. It was a subsidiary of Glen Ellyn and thus was also controlled by Savage and Williams.

Savage first heard of the Blossman company in January 1960, when he was told by a personal friend of his, an investment consultant, that the company was worth looking into because it was in need of financial assistance and its stock was presently undervalued. Savage checked the book value of the company's stock in an investment manual maintained in the plaintiff's office, and by using the plaintiff's teletype service he ascertained the current market value of the stock, which was then being traded at about 3 3/4 points per share.

Savage then telephoned A. R. Blossman, Sr., the president of Blossman company. Savage testified that he had

no recollection of the specific content of this conversation, but he did recall that the purpose of the call was to induce Blossman to use the plaintiff's services. There is no dispute but that at this point Savage was acting as the agent of the plaintiff. On February 5 Savage wrote a follow-up letter to Blossman on the plaintiff's stationery; it read:

"Dear Mr. Blossman:

I was delighted to have the opportunity to converse with you and become acquainted with you and your rapidly expanding L.P.G. business.

Mullaney, Wells & Company, Inc. of Chicago, Illinois are investment bankers of almost thirty years standing. We are members of the Midwest Stock Exchange and principally engaged in municipal underwriting. In addition, over the years, we have developed a noteworthy group of clients for which we have arranged and negotiated an impressive list of acquisitions, mergers and financings. Our principal bank in Chicago is the City National Bank and Trust Company.

As I indicated to you, we have been requested by a private individual to investigate the investment opportunities in the L.P.G. industry. During the past two years, we have invested funds in excess of two million dollars for his account; recently he has become heir to a sizable fortune and consequently his investment program must be accelerated. We, as a firm, are willing to vouch for our client's reputation, fairness and integrity.

As indicated, our client is generally not interested in participating in the day to day management affairs of businesses. However, he desires position on the board of directors to help determine policy and long range decisions of the business. Generally, our client seeks a controlling interest with assurances that management will remain; however, in several instances he has been satisfied with a minority position.

If possible at this given moment, could you please send us the following information, so that we may make the necessary recommendations to our client. Should the requested material meet our clients aspirations, we should like to visit you and your organization and become intimately acquainted with you and your operations.

    1. A brief outline of the history of your company, including present officers and directors, denoting each

director's business interest.

2. A statement as to the Blossman's family's investment in stock and debentures in Blossman Hydratane Gas, Inc.

3. Most recent balance sheet and Profit and Loss statement.

4. A list of fixed assets such as tank ownership etc. Has your company leased any tanks or cylinders to customers? How has your firm financed the tanks and cylinders which they own, etc.

Thanks for the courtesy you extended me on the telephone. I shall be looking forward to hearing from you shortly."

Savage testified that the client referred to in his letter was Howard A. Weiss, who had been engaged in several financial transactions with the plaintiff in which Savage had participated.

The Blossman company had at that time 540,000 shares of common stock outstanding, of which Blossman and three members of his immediate family held 355,758 shares. On February 10, 1960, Blossman wrote the following letter to Savage at the plaintiff's office:

"Dear Mr. Savage:

Your call and interest in our Company was [sic] greatly appreciated. Under separate cover you will receive a letter from my son answering the questions you asked in your letter of February 5th.

I consider our corporate stock ridiculously under valued on the market. You are aware that our stock is a relatively new security on the market, and it takes time to become known. I would not be interested in anything less than approximately three times the present market value for my stock. I realize that you probably would not have any interest at that price, but hope you will at a later date. Our Company has a great future.

I have a personal proposition you may be interested in, however. Enclosed you will find my personal financial statement. I would like to consolidate my liabilities on one long-term note. As you will note, it would take $300,000.00 to do this. I would be willing and able to pay it off in ten equal payments at an interest rate of 6% on the unpaid balance. The three $100,000.00 notes due from my sons and the 150,000 shares of Blossman Hydratane Gas, Inc. Common

Stock securing these notes could be pledged as collateral.

To get this loan, I would give a personal stock option to convert the balance of the loan at any time into our corporate stock at $6.00 per share. The option would start at 50,000 and decrease at 10% per year—on the same basis as the unpaid balance. I feel positive that the person or institution that grants me this loan will make some real money on this conversion.

If you have any interest along those lines, please let me hear from you. If not, possibly we can find some grounds for future dealings. I will keep you informed on our Company's progress."

Over the next several months further correspondence took place between Savage and Blossman, as well as a number of face-to-face meetings. Some of the meetings were also attended by the defendant Williams, whom Savage testified he had decided to bring into the negotiations because of Williams' many financial contacts. Williams and Savage had become acquainted in the course of business dealings between Williams and the plaintiff on which Savage had worked. Savage testified that at the first meeting between him and Blossman there was a discussion of the possibility of raising money for the Blossman company, which desired to expand its operations, through the sale of bonds. According to Savage the large existing indebtedness of the company made such a project unfeasible unless buyers were also to be offered an option to purchase stock in the company at its then market price. Savage testified that Blossman was not prepared to offer options to purchase stock at any price less than $9 or $10 a share, however. There is no evidence that Savage reported this situation either to Weiss or to the officers of the plaintiff.

Savage testified that he and Williams discussed several other financing projects with Blossman, including one which was abandoned, for transporting gas from Texas to Georgia by boat. The principal subject of discussion, however, was a proposal for Savage and Williams to become "partners" in the Blossman company by purchasing stock

in it. This idea was first advanced by Williams in the course of a meeting with Blossman in Chicago in April 1960. It was discussed further at subsequent meetings, and it came to assume the form of an option to purchase common stock in the company from Blossman and the members of his family who, together, held the controlling interest.

Savage testified that Blossman was informed in a meeting held in September that this investment would be for the individual benefit of Savage and Williams and not on behalf of the plaintiff. In addition, during the summer of 1960 Savage, who had been corresponding with Blossman on the plaintiff's letterhead, began preparing and typing his letters to Blossman away from the plaintiff's office, using the letterhead of a different concern, Inland Block Company, in which he and Williams held an interest. In October or November, moreover, according to Savage, he asked Blossman to address all correspondence to him at Inland Block.

After considerable negotiations over its terms, a stock option contract was executed November 7, 1960. The agreement gave Savage and Williams an option to buy 271,000 shares of common stock at $8 per share, totaling $2,168,000, the option to be exercised by April 1, 1961. No consideration was paid for the option. At the time when this contract was made, the common stock of the Blossman company was being traded over the counter at about $3 a share. The stock subject to the option amounted to about 51% of the total stock then outstanding.

Savage and Williams then began efforts to secure financing which would enable them to exercise the option. The first step was to activate the defendant Glen Ellyn Corporation, a dormant corporation which had been organized by Savage's attorney. During March 1961 Glen Ellyn issued 100 shares of common stock, 80 of which went to Savage and Williams, while Savage and Williams

assigned to Glen Ellyn their stock option.

Arrangements were then made for a loan in the amount of $2,168,000 from the Harris Trust & Savings Bank. The Blossman shares were pledged to the bank as security, and the loan was also guaranteed by Bell Intercontinental Corporation. Under the agreement, if Glen Ellyn were to default on its loan, Harris could call upon Bell to repay the loan, and upon doing so Bell would be assigned the Blossman stock. On March 29, 1961, the stock options were exercised subject to the arrangements just described.

Savage testified that by February 1961 the market value of Blossman stock had risen from $3 to $10 as the result of some favorable publicity which the company had received in a financial publication. As a result, many holders of debentures in the Blossman company converted their holdings into common stock, with the further consequence that Savage's and Williams' equity in the company declined from 51% to about 40%. Savage also testified that during January or February Blossman had come to Chicago and asked Savage and Williams to release him from the option contract, but that they refused to do so.

The plaintiff first heard about the option contract on March 28 through telephone calls made to Charles M. Miller, a vice-president of the plaintiff, by a director of the Blossman company and by Blossman. After consultation with Mullaney it was decided to fire Savage. Miller confronted Savage with his knowledge of the option towards the close of business on March 28, but action to discharge Savage was deferred until the following day since Miller was awaiting the arrival of a copy of the option contract, which Blossman had promised to forward. After the close of business, however, Savage cleaned out his desk and departed, taking with him his files on the Blossman matter. He left behind a letter of resignation which he had prepared prior to his encounter with Miller.

The next step in what Savage referred to in his testi-

mony as a plan to build a liquefied petroleum gas empire was to acquire Blue Flame Gas Company and Petroleum Securities Company (referred to collectively herein as BFP). Initially, between April and July 1961, Savage and Williams successfully solicited options from some 2,000 BFP shareholders, representing about 96% of the stock, for the purchase of their shares by Glen Ellyn.

These options were never exercised, however. Instead, Savage and Williams, on August 10, formed a new corporation, American Hydratane Corporation, to which Glen Ellyn assigned both its shares of the Blossman stock and its options to buy the BFP stock. American Hydratane assumed Glen Ellyn's liabilities on the Harris bank loan as well as the guarantee agreement with Bell Intercontinental. In return Glen Ellyn received 287,445 shares of American Hydratane's newly issued stock. American Hydratane, using 173,000 shares of its own stock and about $1.4 million in cash obtained by a new loan from the Harris bank (which was again guaranteed by Bell Intercontinental), then purchased the assets of BFP from its shareholders, and the BFP companies were liquidated.

The acquisition of the BFP enterprises contemplated a further amalgamation, namely a merger with Intex Oil Company, a concern in which Bell owned a 54% interest. Following the BFP acquisition, however, it was learned that a major Intex stockholder opposed the merger, and that project was dropped. Although the record is not wholly clear, it appears that it was this development which led to a refusal by Bell to extend its guarantee on the original Harris bank loan. That action was followed by American Hydratane's default on an installment due, upon which Harris accelerated the due date of the principal of the loan, and called on Bell to make payment. Bell did pay off the loan, in the amount of $2,267,343, and was assigned the Blossman shares.

It does not appear that the plaintiff made any attempt to ascertain the status of the Blossman matter after Savage

resigned in March 1961, and it was not until March or April 1963 that the plaintiff discovered, quite by chance, that the option had been exercised. The present suit was filed on July 3.

At this time Bell, which was still the guarantor of the loan obtained in connection with the BFP acquisition, had threatened to institute bankruptcy proceedings against American Hydratane. In an effort to resolve this situation, Glen Ellyn entered into an agreement on August 9, 1963, with Tenneco Oil Company by which Glen Ellyn would sell its 287,445 shares of American Hydratane to Tenneco for $800,000.

Tenneco required as a condition of the purchase that arrangements be made so that it would not be affected by this suit. Accordingly, an agreement among the plaintiff, Glen Ellyn, Savage, Williams, and Glen Ellyn's other shareholders was executed on August 30 by which the plaintiff agreed to assert no claim to the American Hydratane shares, while Glen Ellyn agreed to deposit one-half of the sale proceeds in escrow to abide the outcome of this suit. Pursuant to this agreement the plaintiff, which had named American Hydratane as a defendant in the original complaint, dropped that company from the suit.

For the sake of completeness we point out that neither Blossman Hydratane Gas, Inc., nor any of its shareholders who sold stock to Glen Ellyn under the option agreement is a party to the present suit, despite the expression of a belief by Blossman in 1961 that the exercise of the option was not legal. Counsel have not advised us of any other litigation relating to the subject matter of this suit, and we therefore assume there is none. *Cf. Eastern v. Canty* (1979), 75 Ill. 2d 566, 574.

We consider first the question whether the defendant Savage violated a fiduciary duty owed to the plaintiff. The plaintiff characterizes this case as one governed by the doctrine of corporate or business opportunity. This court has held that it is a breach of fiduciary obligation for a

person to seize for his own advantage a business opportunity which rightfully belongs to the corporation by which he is employed. (*Shlensky v. South Parkway Building Corp.* (1960), 19 Ill. 2d 268; *Paulman v. Kritzer* (1967), 38 Ill. 2d 101; *Kerrigan v. Unity Savings Association* (1974), 58 Ill. 2d 20; *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289; cf. *City of Chicago ex rel. Cohen v. Keane* (1976), 64 Ill. 2d 559.) The same rule is followed in other jurisdictions. *Lutherland, Inc. v. Dahlen* (1947), 357 Pa. 143, 53 A.2d 143; *Durfee v. Durfee & Canning, Inc.* (1948), 323 Mass. 187, 80 N.E.2d 522; *Guth v. Loft, Inc.* (1939), 23 Del. Ch. 255, 5 A.2d 503; *Rosenblum v. Judson Engineering Corp.* (1954), 99 N.H. 267, 109 A.2d 558; Note, *Corporate Opportunity,* 74 Harv. L. Rev. 765 (1961).

Although they do not so limit the rule, the cases just cited do in fact involve defendants who are corporate officers and directors, or, where the plaintiff is a governmental entity, persons who hold public office. As we have previously pointed out, Savage was not an officer or a director.

The appellate court did proceed on the assumption, nevertheless, that the plaintiff and Savage stood in the relationship of principal and agent, and that Savage was subject to fiduciary obligations with respect to the subject matter of his agency.

We agree, and the defendants do not seriously deny, that a fiduciary relationship existed between the plaintiff and Savage. (*Rieger v. Brandt* (1928), 329 Ill. 21, 27-28; *Lerk v. McCabe* (1932), 349 Ill. 348, 360; *Moehling v. O'Neil Construction Co.* (1960), 20 Ill. 2d 255, 267.) Under standard agency doctrine Savage thus would be obligated to act solely for the benefit of the plaintiff in all matters connected with his agency, and to refrain from competing with the plaintiff. *Byer v. International Paper Co.* (10th Cir. 1963), 314 F.2d 831, 833; *United States v. Drumm* (1st Cir. 1964), 329 F.2d 109, 112; Restate-

ment (Second) of Agency secs. 387, 393 (1958); H. Reuschlein & W. Gregory, Agency and Partnership secs. 67-68 (1979); W. Seavey, Agency sec. 151 (1964).

The rationale of the appellate court's holding that Savage did not violate any fiduciary obligation to the plaintiff, as we understand it, is that while the plaintiff's business operations included both the occasional making of investments on its own account (referred to by the court as "two-party" transactions), and acting, for a fee, as a broker between businesses in need of funds and potential investors (referred to as "three-party" transactions), Savage's contractual duties were limited to the latter, since in the court's view the only compensation above his base pay to which he was entitled was a share of brokerage fees. Since the Blossman transaction did not involve a brokerage fee, it was not within the scope of his contractual duties.

We find this analysis defective in several respects. To begin with, the appellate court is incorrect in stating (66 Ill. App. 3d 853, 868-69) that Savage's compensation was necessarily limited to a share of the placement fees which would be earned by the plaintiff in a "three-party" transaction. The term used in the contract is not net fees but net profits. The latter could also include profits made by the plaintiff in the resale of stock or other securities which it had acquired for its own account.

The plaintiff had indeed engaged in a transaction of that character in December 1957, shortly after Savage was hired, when it purchased the entire outstanding stock of the Arlington Heights Bank through the exercise of stock options acquired from its stockholders. According to the testimony of the plaintiff's president, the purchase had originally been made with the intention of holding the stock as an investment. When it was later decided to sell the stock instead, the sale was made at a profit of about $70,000.

It appears that Savage performed some work in con-

nection with this transaction, although the extent of it is in dispute. He was not credited with any share of the profits on the Arlington Heights Bank matter, a fact which Savage contends demonstrates that the plaintiff understood that no compensation would be payable on a two-party transaction. The evidence also shows, however, that the transaction was originated by another employee some time before Savage had become employed by the plaintiff, and that that employee was compensated by an opportunity to purchase some of the bank's stock, which he later resold at a profit. Witnesses for the plaintiff thus attributed the lack of payment to Savage to the fact that he had not originated the transaction.

Since it was the master who heard the testimony, his findings on matters as to which the testimony is in conflict are entitled to great weight. *Uksas v. Zelensky* (1961), 21 Ill. 2d 303, 311-12; *Galler v. Galler* (1975), 61 Ill. 2d 464, 473.

A second difficulty with the theory used by the appellate court is that when an agent begins his exploration of an investment possibility it may not be possible to determine what form it will ultimately assume. The Blossman negotiations furnish an illustration of the problem. Savage's initial letter to Blossman was written in the belief that the Blossman company or its controlling stockholders might desire funds and that a client of the plaintiff's, Weiss, might be in a position to advance them. Had this expectation been fulfilled the plaintiff and Savage would each have received their share of the brokerage fee. On the other hand, if the Blossmans and Weiss were unable to reach an agreement, Savage could have sought, and perhaps found, a new investor, which might have been another third party or possibly the plaintiff itself.

We may assume with the appellate court that Savage had no affirmative contractual duty to seek out investment opportunities for the plaintiff as opposed to brokerage opportunities. We may also assume that Savage might have

concluded in good faith that further attempts to develop a loan or stock-purchase plan suitable for the Blossmans were fruitless, and that he might then have abandoned those attempts consistently with his contractual duties. It does not follow, however, that Savage, while still remaining as an employee of the plaintiff, could then, in the appellate court's words, "begin to act on his own." To accord Savage the option of substituting himself as the investing party without the consent of the plaintiff is to place him in a position where his personal interests will conflict with his duties to his principal. The situation is in principle indistinguishable from that of a real estate broker engaged to sell property owned by his principal who, without full disclosure of all material facts, acquires an interest in the property himself. *Perry v. Engel* (1921), 296 Ill. 549; *Rieger v. Brandt* (1928), 329 Ill. 21, 27-28; *Gilman, Clinton & Springfield R.R. Co. v. Kelly* (1875), 77 Ill. 426, 434; Restatement (Second) of Agency sec. 387, illustration 1 (1958).

It is not an answer to state, as does the appellate court, that there is no evidence that the plaintiff either "contemplated" or "would have desired to make" a stock purchase of this magnitude. That is a decision to be made by the plaintiff upon disclosure of the pertinent facts. In *Kerrigan v. Unity Savings Association* (1974), 58 Ill. 2d 20, 28, the court commented upon a comparable situation involving the seizure of a corporate opportunity by directors as follows: "If the directors fail to make such a disclosure and to tender the opportunity, the prophylactic purpose of the rule imposing a fiduciary obligation requires that the directors be foreclosed from exploiting that opportunity on their own behalf."

The comment is equally apt here. (See also *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 304-05.) The record is clear that Savage never mentioned the Blossman option to the plaintiff's officers until March 28, 1961, months after the option agreement had been executed and

only a few days before the option was exercised. And even at that late date it was not Savage who disclosed the facts; he merely confirmed information that had just been disclosed by an outside person associated with the Blossman company. We thus conclude that the defendant Savage did breach his fiduciary obligations to the plaintiff.

We turn next to the question whether the defendants Williams and Glen Ellyn were also liable for the actions of Savage, a point which the appellate court did not reach. The master found that Williams and Savage were partners in the Blossman transaction, and that Williams thus became jointly and severally liable for the acts of Savage. Although Savage and Williams did not have a formal partnership agreement, each of them testified that they had an oral understanding that there would be a 50-50 sharing of profits; each of their names appeared on the stock options; and Williams participated actively in the negotiations from an early stage.

Williams was necessarily aware that the plaintiff would not be a participant in the Blossman transaction. The master also found that Williams' prior contact with Savage in a transaction handled through the plaintiff put Williams on notice of Savage's relationship to the plaintiff, and that he should have inquired of the plaintiff as to whether it had any interest in the Blossman transaction. The master accordingly concluded that Williams was liable to the plaintiff for Savage's breach of fiduciary obligations.

As for Glen Ellyn, since Savage and Williams were its president and vice-president, respectively, and also two of its three directors, the third being their attorney, and since the benefits to it from the Blossman transaction were not received as a *bona fide* purchaser without notice, the master found Glen Ellyn liable as well.

We agree with the conclusions reached by the master with regard to both Williams and Glen Ellyn.

The plaintiff asserts that the defendants are liable to

it for the sum of $800,000, the amount received by Glen Ellyn from Tenneco for the sale to the latter of the 287,445 shares of American Hydratane stock owned by Glen Ellyn. The question is whether this relief is warranted.

The various steps in the transaction at hand have been described earlier. They may be recapitulated as follows:

(1) In March 1961 Savage and Williams assigned to Glen Ellyn their options to buy the Blossman stock plus $1,200 in cash in return for which they received 80% of Glen Ellyn's stock.

(2) On March 29, Glen Ellyn exercised the options, purchasing 298,100 shares for the sum of $2,168,000, which was obtained by a bank loan guaranteed by Bell.

(3) Later in 1961 Glen Ellyn acquired options to purchase BFP stock.

(4) On August 10, Glen Ellyn assigned its Blossman stock and its BFP options to American Hydratane, which assumed Glen Ellyn's obligations under the bank loan. Glen Ellyn received 287,445 shares of newly issued American Hydratane stock.

(5) On August 15, American Hydratane purchased the assets of BFP in return for about $1.4 million in cash obtained through a loan and 173,000 shares of additional stock.

(6) In June 1962 American Hydratane defaulted on the bank loan. The loan was paid off by Bell, and the latter acquired the Blossman stock.

(7) In August 1963 Glen Ellyn sold its shares of American Hydratane stock to Tenneco for $800,000.

The relief sought by the plaintiff in its second amended complaint was a judgment against the defendants for the $800,000 which Glen Ellyn was paid by Tenneco. The theory of the complaint was that since the American Hydratane shares had been received in exchange for the

Blossman stock the former were subject to the same constructive trust which would have attached to the latter. (*Winger v. Chicago City Bank & Trust Co.* (1946), 394 Ill. 94, 111.) By a parity of reasoning, the plaintiff contends, it was entitled to receive the proceeds received by Glen Ellyn for the Hydratane stock.

The appellate court rejected this claim on the ground that the Blossman stock, having already been forfeited by American Hydratane, could not have formed any part of the consideration for the payment of the $800,000, which must be regarded as having been made in exchange for other property still owned by American Hydratane, principally the assets of BFP which it had acquired in August 1961 shortly after acquiring the Blossman stock.

We think this analysis of the matter is incorrect. The Blossman stock is significant here because of its value to the plaintiff in 1961, not its value to Tenneco in 1963. If property has been acquired in violation of fiduciary duties, a subsequent loss of the property, like a subsequent diminution in its value, does not reduce the amount to which the plaintiff had become entitled. (Restatement of Restitution sec. 161 (1937).) The forfeiture of the Blossman stock was not a fortuitous event, moreover; it came about as the direct result of American Hydratane's failure to make payment on the loan which enabled Glen Ellyn to purchase the stock.

We also question whether a determination of the plaintiff's right to restitution required a tracing of trust property into its product, as the appellate court assumed. No right is asserted here to the shares of American Hydratane stock which Tenneco purchased, but only to a sum of money received by one of the defendants. The plaintiff was entitled to recover a money judgment for the value of the Blossman stock, and it was not required to pursue the trust property. (Bogert, Trusts and Trustees sec. 867 (2d ed. 1962).) It was that proposition on which the master based his recommendation that a judgment be entered in

favor of the plaintiff.

When Glen Ellyn acquired the Blossman stock on March 29, 1961, it carried the stock on its books at $3,068,000, which is $900,000 above the price paid for it. This difference was attributable to an increase in the market value of the stock to about $10 per share as compared to the option price of $7, and thus it did reflect the value of the stock at that time. When the stock was assigned to American Hydratane, as the master found, it was the only asset shown to have been transferred in exchange for Hydratane shares, and again it was listed at a value of $3,068,000 in both the balance sheet of American Hydratane, which appeared in a proxy statement, and in Glen Ellyn's Federal tax return for 1961. The defendants' duty to make restitution could not be diminished by their subsequent loss of that property through forfeiture, any more than it would be if the value of the Blossman shares had been dissipated in some imprudent investment. We hold accordingly that the plaintiff was entitled to judgment in its favor for $800,000.

The defendants Savage and Williams have filed a cross-appeal challenging the denial of their motion to bar the plaintiff's attorneys from representing the plaintiff in this action because of a claimed conflict of interest. The claimed conflict arises from the fact that the law firm represented American Hydratane in 1961 in connection with that company's acquisition of the BFP companies. While American Hydratane is no longer a party to this action, in 1961 it was wholly owned by the defendant Glen Ellyn and 80% of the latter's stock was then held by Savage and Williams. The defendants ask that all costs, expenses, and attorney's fees be taxed against plaintiff's attorneys, and that the case be remanded to the circuit court to determine the amount involved. The plaintiff denies that the former representation of American Hydratane by the law firm resulted in any prejudice to the defendants. The appellate court found it unneces-

sary to pass upon this point because of its affirmance of the circuit court's dismissal of the complaint.

We cannot say on the record here that the circuit court erred in denying the motion of Savage and Williams to bar the plaintiff's attorneys from the case. The relief sought through the cross-appeal is denied.

The option contract of Savage and Williams was entered into with Blossman in November 1960, and the option was exercised in March 1961. This was the violation of the fiduciary obligation upon which the plaintiff's case was founded. The American Hydratane Corporation was not formed until August 10, 1961, and the claimed representation of it by the plaintiff's attorneys followed. Savage and Williams do not show how the representation of American Hydratane by the attorneys after the breach of the fiduciary obligation took place could have affected their defense against the plaintiff's complaint of the breach. They do not suggest what kind of evidence might have been available were it not for the claimed conflict. Savage and Williams were completely aware of the law firm's representation of American Hydratane. The attorneys who represented Glen Ellyn Corp. knew of it. Savage and Williams did not propose any findings to the master in chancery relating to a conflict. The master's report was submitted to the chancellor on February 1, 1971, and on October 4, 1971, Savage and Williams raised the conflict issue by filing objections. It was not until April 26, 1973, that they moved to disqualify the law firm.

On this appeal we of course are not sitting as a tribunal to weigh charges of unprofessional conduct as such. That does not mean that the charge of Savage and Williams must go unheard. We observe that in Savage's brief it is stated that Savage and Williams, "without benefit of counsel," have filed a complaint against the attorneys with the Attorney Registration and Disciplinary Commission.

For the reasons given in this opinion, the judgment of

the appellate court is reversed, and the cause is remanded to the circuit court with directions to overrule the defendants' exceptions to the master's report and to enter judgment in favor of the plaintiff.

*Reversed and remanded,*
*with directions.*