BLACKMAN KALLICK BARTELSTEIN, a Partnership, *et al.*, Plaintiffs-Appellants, v. SAMUEL M. SORKIN *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—89—2651

Opinion filed May 21, 1991.

Michael L. Shakman, Barry A. Miller, and Edward W. Feldman, all of Miller, Shakman, Hamilton & Kurtzon, of Chicago, for appellants.

Ellen G. Robinson, C. Philip Curley, and Alan F. Curley, all of Kahn, Robinson, Curley & Clayton, of Chicago, for appellees.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Plaintiffs, Blackman Kallick Bartelstein and Blackman Kallick and Company, Ltd. (BKB), appeal from (1) the circuit court's denial of injunctive relief which they sought against defendants; (2) the court's refusal to impose a constructive trust upon an asset acquired by defendant Samuel M. Sorkin (Sorkin) in connection with an alleged breach of his fiduciary duty; and (3) an order dismissing defendant DiPietro from the case.

The following evidence was adduced at the hearing on BKB's motion for a preliminary injunction. Although its promotional materials describe it as an accounting firm, BKB's witnesses testified that it also makes investments and advises clients of potential investment opportunities. In 1984, BKB hired Sorkin as an accountant, specializing in taxation. While the record is not clear how often it occurred, BKB did, during the period of Sorkin's employment with the firm, present its clients with investment opportunities, and BKB itself, on at least one occasion, invested as a firm in a limited partnership. In its complaint, BKB alleged that it had a "regular practice" of "considering"

investments as a firm; but while BKB's managing partner, Harvey Kallick, testified that the firm had "considered" six investments over the last 10 years, three other partners testified that there was no such practice. BKB admitted in its answers to interrogatories that it had never told Sorkin about this alleged "regular practice." Two partners, including Kallick, admitted to having made investments for themselves after having learned about them from clients without first offering them to the firm.

BKB's "Administrative Manual," which it distributed to its employees, including Sorkin, stated:

> "We expect you to devote your best efforts to the firm's work; therefore, do not undertake outside work. Exceptions to this requirement need advance approval of the Managing Partner."

BKB also required employees to make entries on a form provided by the firm entitled "Management By Objectives" (MBO); the form included one column headed "Push Acquisitions for Clients." Sorkin never indicated anything as to "Push Acquisitions for Clients" on his MBO forms, and although he met almost every month with his superior to review the forms, it seems never to have been an issue between employer and employee.

In September 1986, Larry Ginsburg, an auditor in the employ of BKB, asked Sorkin for tax advice concerning the proposed sale of a company that did business under the name of "Grendel's Rapid Oil Change" (Grendel's). Ginsburg testified that Grendel's was his own client and that he did not bill the accounting work he did for that enterprise through BKB.

Sorkin testified that before he agreed to help Ginsburg on the Grendel's transaction, Ginsburg told him that Kallick knew about and approved of Ginsburg's outside practice. In his testimony, Ginsburg denied that he had said that Kallick approved of the outside practice, but admitted that he told Sorkin that Grendel's was too small a client for BKB to handle. The testimony also disclosed that BKB had a practice of referring clients to other accounting firms if they could not afford to pay its standard rates; however, Sorkin testified that he was not aware of any policy that a $375,000 transaction, the amount involved in the Grendel's deal, was too small for BKB to handle. Sorkin ultimately billed Grendel's $950, which is more than BKB had billed some clients he had brought into the firm.

In September of 1986, when Sorkin learned from Ginsburg that the impending sale of Grendel's had fallen through, Ginsburg invited Sorkin to invest in Grendel's with him. They agreed to purchase it and formed defendant G & S Rapid Oil Change, Inc., and defendant

G & S Real Estate Co., a partnership (collectively G & S). The sale of the business and real estate closed on October 31, 1986. Sorkin left BKB in December of 1986. In February 1988, Ginsburg sold his share in G & S to defendant James DiPietro, and a year later, Ginsburg disclosed the Grendel's deal to Kallick.

BKB filed its complaint in three counts on March 30, 1989. Count I sought declarations that, as an agent and employee of BKB, Sorkin breached his fiduciary duties of loyalty and fair dealing by working secretly for Grendel's, failing to advise BKB of the Grendel's investment opportunity, and investing for himself in Grendel's. BKB further requested a ruling holding it to be the equitable owner of a one-half interest in G & S. Count II prayed for an injunction preventing distribution of G & S' income or assets, the imposition of a constructive trust requiring Sorkin to turn over to BKB his share of G & S, and an accounting of Sorkin's profits from G & S. Count III sought an accounting under the disloyal servant doctrine to recover from Sorkin all salary he earned while he was allegedly disloyal to BKB.

The trial court granted BKB's motion for a temporary restraining order on March 31, 1989. During the hearing on the motion for a preliminary injunction, DiPietro moved under section 2—1110 of the Civil Practice Law (Ill. Rev. Stat. 1987, ch. 110, par. 2—1110) for judgment in his favor, arguing that he was an innocent third party and should not be held accountable for Sorkin's and Ginsburg's alleged misconduct. The court granted DiPietro's motion.

On June 29, 1989, in a memorandum opinion handed down from the bench, the trial judge denied BKB's motion for a preliminary injunction, holding that BKB did not show irreparable harm or that it did not have an adequate remedy at law, and that Sorkin was under no fiduciary duty to report business opportunities to BKB. The court found that there was notably absent in the administrative manual any requirement that employees bring investment opportunities to BKB's attention, nor did any other document corroborate BKB's asserted practice of considering opportunities presented by clients; thus, "BKB did not engage in a regular practice of considering business investments for themselves, but did so, if at all, on an informal and infrequent basis ***, not governed by any firm policy, [and] not communicated to its non-partner employees." Finally, as to BKB's alleged practice of seeking out business opportunities in order to present them to its clients, the court stated only that it "is not a basis for imposing a constructive trust on Sorkin."

On July 13, 1989, the trial judge dissolved the TRO. On July 28, 1989, defendants filed an interlocutory appeal, requesting

"that the appellate court order the circuit court to decide defendants-appellants' motions to dissolve *nunc pro tunc* [the TRO] to June 29, 1989, prior to the pronouncement and Memorandum of Opinion denying the preliminary injunction, as had been requested by defendants-appellants, to preserve defendants-appellants' right to petition the circuit court for damages pursuant to Illinois Code of Civil Procedure section 11—110, for wrongful issuance of the temporary restraining order."

The circuit court entered an order on August 3, 1989, denying defendants' request for a finding of wrongful issuance; granting DiPietro's section 2—1110 motion for a finding at the close of BKB's case in chief; and denying plaintiffs' motion for a preliminary injunction.

On August 11, 1989, BKB filed an "interlocutory cross-appeal and appeal" from:

"(1) The Order of August 3, 1989 denying Plaintiffs'-Cross-Appellants' motion for preliminary injunctive relief and granting the section 2—1110 oral motion of Defendant-Appellant James DiPietro for a directed finding at the close of plaintiff's case;

(2) The Order of July 13, 1989 dissolving the Temporary Restraining Order previously entered in this case on March 31, 1989;

(3) The Memorandum of Opinion of June 29, 1989 * * *."

On September 6, 1989, defendants moved to voluntarily dismiss their own appeal, and the trial court granted the motion on September 11, 1989. On September 12, 1989, judgment was entered against BKB and in favor of the defendants on count I "with respect to Sorkin's purported breach of fiduciary duty by purchasing Grendel's" and in favor of defendants with respect to count II. Also on September 12, 1989, defendants filed a motion to dismiss BKB's interlocutory appeal, alleging that this court lacked jurisdiction because BKB filed the record late under Rule 307. (134 Ill. 2d R. 307(a).) On September 22, 1989, BKB filed another notice of appeal from:

"The Order of September 12, 1989 entering (a) Judgment in favor of Defendants on Count I of the Verified Complaint with respect to Defendant Sorkin's alleged breach of fiduciary duty by purchasing Grendel's Rapid Oil Change; and (b) Judgment in favor of Defendants on Count II of the Verified Complaint."

On September 26, 1989, defendants' motion to dismiss BKB's appeal was taken with the case and its two appeals were later consolidated. Also on September 26, 1989, and on November 20, 1989, this

court granted BKB extensions of time to file the record on appeal which resulted in its being filed by stipulation on December 20, 1989.

Defendants allege that BKB's first appeal should be dismissed because it improperly cross-appealed from an interlocutory order. Defendants add that "BKB's attempt to appeal from denial of the preliminary injunction and related orders in its second Notice of Appeal *** should also be dismissed because an interlocutory order appealable as of right must be appealed, if at all, pursuant to Rule 307," and that a party's failure to appeal an interlocutory order reviewable under Rule 307 within 30 days of its entry "renders that order the law of the case and that part of the resulting judgment *res judicata*."

■■ Defendants stated in their notice of interlocutory appeal that they were appealing "from the Memorandum of Opinion entered [*sic*] June 29, 1989, and the court's oral pronouncement on June 29, 1989." However, under Supreme Court Rule 307(a) (134 Ill. 2d R. 307(a)), an interlocutory appeal may be taken *only* "from the *entry* of the interlocutory *order*" (emphasis added) (see *Granite City Lodge No. 272 v. City of Granite City* (1990), 141 Ill. 2d 122), and defendants clearly did not appeal from the *entry* of any *order*. But before any issue arose over this court's jurisdiction over their "appeal," and after BKB had filed its "Notice of Interlocutory Cross-Appeal and Appeal," defendants voluntarily dismissed their appeal. Therefore, as defendants acknowledge in their reply in support of their motion to dismiss BKB's first appeal, "BKB's Notice [of interlocutory cross-appeal and appeal] should be interpreted as a direct appeal from the only orders BKB admits it could appeal: those entered on July 13 and August 3." (See *Board of Education v. Chicago Teachers Union, Local 1* (1975), 26 Ill. App. 3d 806, 809 n.1.) Subsequently, on October 10, this court consolidated BKB's August 11, 1989, appeal with its appeal from the September 12, 1989, order. Clearly, then, BKB's August 11 appeal, as consolidated with its later appeal, is properly before this court. Furthermore, in light of the clear provisions of Supreme Court Rule 307(a)(1) (134 Ill. 2d R. 307(a)(1)), we fail to comprehend defendants' confusion over the propriety of BKB's filing of an appeal, whatever its denomination, in the wake of their own. We perceive no requirement that BKB's had to be a separate appeal, bearing its own case number, after which it could have moved to consolidate the two appeals, as defendants suggest. Significantly, however, they advance no authority for such a proposition.

Contrary to defendants' alternative contention, BKB's entire August 11, 1989, appeal was timely, having been filed within 30 days of both the July 13, 1989, order dissolving the TRO and the August 3,

1989, order denying BKB a preliminary injunction and dismissing Di-Pietro from the case. And also contrary to Sorkin's allegations, the 30-day period begins to run from the time the order is entered, not when the memorandum of opinion was filed. (134 Ill. 2d R. 307 (a).) Indeed, the trial judge's memorandum of opinion ends with the command to counsel: "Draft order instanter consistent with the above opinion," thus eliminating any thought that he was entering an order by the issuance of his memorandum, which is clearly stamped as having been merely "filed."

■ Defendants' additional claim that this court does not have jurisdiction of this cause for the reason that BKB failed to file the record within the required time is also without warrant, for they are abundantly aware that BKB was properly granted extensions of time by this court for that purpose pursuant to Supreme Court Rule 307(a). (134 Ill. 2d R. 307(a).) Consequently, defendants' motion to dismiss which was taken with the case is denied. We also deny BKB's request for the imposition of sanctions on defendants in light of its own confusion, demonstrated in its "Notice of Interlocutory Cross-Appeal and Appeal."

■ In order to be entitled to a preliminary injunction, "a plaintiff must show (1) a clear right or interest needing protection, (2) the absence of an adequate remedy at law, (3) irreparable harm if the injunction is not granted, and (4) a reasonable likelihood of success on the merits [citations]." (*Preferred Meal Systems, Inc. v. Guse* (1990), 199 Ill. App. 3d 710, 718.) In denying BKB a preliminary injunction, the trial court held that it had an adequate remedy at law and that it would suffer no irreparable harm if it were not granted injunctive relief; accordingly, on motion of defendants, and without objection, the court entered judgment for defendants "on count I with respect to Sorkin's purported breach of fiduciary duty by purchasing Grendel's." The court further declined "to enter judgment on that part of count I alleging the performance of accounting work for Grendel's without compensation to BKB as well as all of the issues alleged in count III." Finally, the court entered judgment in favor of defendants on count II as to all of the issues raised therein. Without objection, Supreme Court Rule 304(a) language was included in the judgment order with respect to the court's holdings as to counts I and II, thus making the judgment final by agreement of the parties. On appeal, BKB does not challenge the trial court's findings of fact, nor does it raise any issue in its briefs as to the trial court's holdings with respect to the existence of an adequate remedy at law and the absence of irreparable harm, insofar as they relate to Sorkin's "moonlighting." We are

therefore bound to the standard only of whether the trial court has misconstrued or misapplied the law pertinent to the issues it has decided.

BKB contends that the holding of the trial judge "squarely conflicts" with the opinion of our supreme court in *Mullaney, Wells & Co. v. Savage* (1980), 78 Ill. 2d 534, arguing that under the holding of that case, Sorkin must be held to have violated his fiduciary duties of fair dealing and loyalty to his employer when he learned of a valuable investment through his agency and took advantage of it for his personal gain. In *Savage*, "the plaintiff's business operations included both the occasional making of investments on its own account *** and acting, for a fee, as a broker between businesses in need of funds and potential investors." (78 Ill. 2d at 547.) Defendant Savage learned, in the course of his employment, of an opportunity to purchase a company's stock, which he acquired without notifying his employer, the plaintiff. The appellate court held that Savage did not violate any fiduciary obligation to plaintiff because Savage's contractual duties were limited to those transactions in which plaintiff acted as a broker, "since in the court's view the only compensation above his base pay to which he was entitled was a share of brokerage fees. Since the [transaction at issue] did not involve a brokerage fee, it was not within the scope of his contractual duties." 78 Ill. 2d at 547.

The supreme court found the appellate court's analysis to be "defective" for having incorrectly construed the parties' employment agreement as limiting Savage's compensation to the sharing of brokerage fees; the contract called, instead, for a division between the parties of the net profits earned by plaintiff's industrial financing division headed by Savage, and the supreme court held that the term "net profits *** could also include profits made by the plaintiff in [transactions it had engaged in] for its own account." The supreme court found that Savage had performed some work in connection with one such transaction unrelated to the disputed one, and that Savage was not credited with any share of the profits realized by the plaintiff on that matter because Savage had not originated the deal. The supreme court went on to hold that Savage had violated his fiduciary duties by acquiring the stock without first notifying plaintiff. 78 Ill. 2d at 550.

It cannot escape notice, from a reading of *Savage*, that the defendant there had *scienter* that his employer was in the business of making investments of its own besides bringing "businesses in need of funds and potential investors" together. (*Savage*, 78 Ill. 2d at 547.) That both the appellate court and the supreme court so found is clear

from their references to the nature of the employer's business: "[P]laintiff's business operations included both the occasional making of investments on its own account ***, and acting, for a fee, as a broker between businesses in need of funds and potential investors ***." (*Savage*, 78 Ill. 2d at 547.) As we have noted earlier, the supreme court parted company with the appellate court in the matter of interpreting the role played by the compensation paid by Mullaney, Wells to Savage, *i.e.*, whether it was in the form of brokerage fees or net profits; and since the contract of employment called for net profits, that term was held by the higher court to include profits made by the plaintiff in transactions it entered into for its own account. Notice to Savage was further held to plainly exist in the fact that he had very early in his employment participated in his employer's purchase of the entire outstanding stock of an enterprise through the exercise of stock options acquired from its stockholders—a transaction very similar to the one Savage had engaged in for his own account. Hence, the supreme court's comment that "[t]he situation is in principle indistinguishable from that of a real estate broker engaged to sell property owned by his principal who, without full disclosure of all material facts, acquires an interest in the property himself." *Savage*, 78 Ill. 2d at 549.

■ Here, the trial judge found that Sorkin was not notified in any way of BKB's alleged practice of making investments as a firm, and held that, thus, the duty to notify BKB of an investment opportunity was not within the scope of Sorkin's agency. Although Kallick testified that the firm "considered" investments on six occasions, several other partners of the firm testified that they were not aware of any practice of making investments as a firm. The court further found that the administrative manual of some 200 pages that BKB distributed to its employees made no mention of the firm's alleged practice of making investments; that no other document imposed "any obligation upon its employees to bring to its attention business opportunities in which it could invest"; that BKB's minutes indicated that in the 10-year period prior to the filing of its lawsuit, the firm acted upon only one investment opportunity, as to which there is no indication that Sorkin had any knowledge; indeed, the record is clearly to the contrary, for in BKB's answers to interrogatories it stated that it never notified Sorkin of its asserted practice of investing on its own account. Further, the court distinguished *Savage* on the basis that there the defendant's "employer was in the business of finance and investments for the benefit of third person clients and/or for the benefit of itself. BKB was in the business of providing accounting services,

*not* in the *business* of making firm investments in client businesses." (Emphasis is the court's). We agree with the trial judge's analysis of *Savage* and his conclusion that it has no applicability to the case at bar.

BKB also contends that because Sorkin would not have known about the investment opportunity in Grendel's but for his violation of the administrative manual's provision against doing work for nonfirm clients, he should not be able to profit from such activities. However, BKB overlooks that the trial court purposely reserved making any finding as to whether the allegations contained in BKB's complaint were true that Sorkin "did not devote full time to BKB business"; that he did not, as he was required, "bring in Grendel as a client to the BKB firm"; and that he kept the fee he charged "for work done for Grendel which fee rightfully belonged to BKB." The court further stated that the resolution of the question of whether these acts, if proved, were wrongful would "have to await a trial on the merits or be resolved in another forum." Accordingly, BKB begs the question in making its "but for" argument; and since it is not the function of this court to make factual determinations, we must, *per force*, decline to decide this issue. *Board of Education v. Chicago Teachers Union, Local 1* (1975), 26 Ill. App. 3d 806, 813.

However, even if BKB were to prove that Sorkin wrongfully moonlighted, we agree with the trial judge's conclusion that it would not be entitled to a constructive trust. Although the imposition of such a trust for BKB's benefit might be appropriate if Sorkin had a duty to present investment opportunities to it, as we have noted above, Sorkin plainly did not have such a duty. Therefore, it would be highly inequitable to confer trustee status upon BKB's theory that since Sorkin was subject to a work rule that required him to refrain from moonlighting, he consequently had a duty to bring in clients to the firm, and that had he complied with this duty, BKB would have heard of the Grendel's opportunity and would have taken advantage of it. Even if we accept such reasoning, we would be constrained to hold that the link between Sorkin's moonlighting and his taking advantage, to BKB's detriment, of the Grendel's opportunity is too laden with tortuous attenuations to warrant the award of equitable relief. See *Labarbera v. Labarbera* (1983), 116 Ill. App. 3d 959, 966.

BKB cites *Kerrigan v. Unity Savings Association* (1974), 58 Ill. 2d 20, which dealt with "corporate opportunities," as holding that the fiduciary duties of a director are similar to those of an agent. However, it cannot be gainsaid that the corporate opportunity doctrine, which involves directors, is more exacting than the fiduciary obliga-

tions of an employee; thus, *Kerrigan* does not apply. (See *Radiac Abrasives, Inc. v. Diamond Technology, Inc.* (1988), 177 Ill. App. 3d 628, 637.) In *Radiac*, the plaintiff, citing *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, alleged that the defendants, as employees of the plaintiff, had fiduciary duties that were the same as those of officers or directors of a corporation. However, as in the case before us, "[d]efendants *** were neither officers nor directors, and *Vendo* is therefore distinguishable." (177 Ill. App. 3d at 637.) It is to be noted also that BKB's counsel acknowledged at the hearing before the trial court that this is not a corporate opportunity case.

Finally, BKB argues:

> "Although, as shown above, *Savage* does not require proof of an employer's investment history, BKB attempted to present, in the alternative, substantial evidence that when it declined opportunities to invest on its own account it would offer those opportunities (1) to its clients and/or (2) to its shareholder-principals, *i.e.*, the 'partners' at BKB. The trial court allowed evidence as to the first category, but then refused to consider it in its ruling because 'it is not a basis for imposing a constructive trust on Sorkin.' [Citation.] The Court excluded all evidence in the second category. [Citation.] These rulings were incorrect as a matter of law because the trial court required, on the one hand, that BKB show that it had a practice of considering investment opportunities, yet the trial court refused, on the other hand, to consider much of BKB's evidence in support of this practice."

Defendants contend, however, as to BKB's offering investment opportunities to its clients, that it has waived the issue because although it was pleaded in BKB's reply, it was not mentioned at all in its complaint. However, "[a]n objection that an issue was not raised in the pleadings may be waived by the conduct at the trial of the objecting party or by introduction of evidence on the issue." (*Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510, 518.) While Sorkin's counsel argued in the trial court that the issue was not raised in the complaint, both parties addressed the matter in their opening statements, in their arguments on DiPietro's motion to dismiss, in their closing arguments, and in the testimony of various witnesses; thus, the point is appropriately before this court.

■ Reverting now to the merits, BKB, as noted above, contends that even if it is held not to have had "an employer's investment history," the trial court improperly excluded and disregarded evidence "that *when it declined opportunities to invest on its own account it*

would offer those opportunities (1) to its clients and/or (2) to its share-holder-principals, *i.e.*, the 'partners' at BKB." (Emphasis added.) "In hiding Grendel's from BKB," it adds, "Sorkin deprived BKB of this valuable opportunity to establish good will [with its clients], earn fees relating to the acquisition, and generate a stream of income." There-fore, it concludes, since "Sorkin was unjustly enriched by his decep-tion of BKB, a constructive trust is necessary to remedy this unjust enrichment." Yet, it is clear that the offering to the clients and the partners is stated by BKB itself to derive from and to be dependent upon BKB's declining the opportunity in the first place. BKB's argu-ment, then, is obviously but another way of saying that Sorkin had a duty to notify BKB of investment opportunities for its own account. Moreover, BKB fails to recognize that Sorkin did not owe any duty to the shareholder-principals as individuals; any duty he owed would be due only to the partnership/corporation. (See *Mears v. Crocker First National Bank* (1950), 97 Cal. App. 2d 482, 218 P.2d 91.) Conse-quently, we affirm the trial court's holding as to this matter as well.

The parties appear to be in agreement that if a constructive trust for BKB's benefit is inappropriate, DiPietro is not liable to BKB. BKB states, "DiPietro's liability flows from Sorkin's liability as a matter of law. Once it is established that Sorkin breached his fiduci-ary duty to BKB, it follows that DiPietro is liable to BKB as well." This is BKB's sole argument as to its entitlement to a constructive trust upon DiPietro's share in G & S. Sorkin states that "if Sorkin is not liable to BKB, DiPietro is not liable either, and BKB does not con-tend otherwise." Therefore, because the trial court properly held that BKB is not entitled to a constructive trust upon Sorkin's share of Grendel's, summary judgment in favor of DiPietro was also proper.

Accordingly, this case is affirmed and remanded to the circuit court for further proceedings consistent with the views expressed in this opinion.

Affirmed.

BILANDIC* and DiVITO, JJ., concur.

---

*Justice Bilandic participated in hearing oral argument in this case and in the deci-sion-making process before he left the appellate court.