REGAL–BELOIT CORPORATION,
Plaintiff,

v.

J. Cameron DRECOLL, Dennis Palmer, Patrick Rosmonowski, Brad Foote Gear Works, Inc., Stewart Ward and Michael Iglar, Defendants.

No. 96 C 3694.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 6, 1996.

Richard M. Franklin, Donald J. Hayden, John Michael Murphy, William Lynch Schaller, Baker & McKenzie, Chicago, IL, for Regal-Beloit Corp.

Randall L. Mitchell, James Dominick Adducci, Marshall Lee Blankenship, Adducci, Dorf, Lehner, Mitchell & Blankenship, P.C., Chicago, IL, for J. Cameron Drecoll, Dennis Palmer and Patrick Rosmonowski.

Thomas Joseph McNulty, Keck, Mahin & Cate, Chicago, IL, June K. Ghezzi, Peter Nels Larson, Gregory David Isbell, Jones, Day, Reavis & Pogue, Chicago, IL, for Brad Foote Gear Works, Inc.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Plaintiff Regal–Beloit Corporation ("Regal–Beloit") filed its original Complaint in this action on June 18, 1996, alleging that Defendants J. Cameron Drecoll ("Drecoll"), Dennis Palmer ("Palmer"), and Patrick Rosmonowski ("Rosmonowski") (collectively "the Individual Defendants") conspired to, and did, in fact, breach their fiduciary duties of loyalty and confidence to Regal–Beloit by pursuing on their own behalf the acquisition of Defendant Brad Foote Gear Works, Inc. ("Brad Foote"), notwithstanding the Individual Defendants' awareness of Regal–Beloit's continuing interest in acquiring Brad Foote. In its Complaint, Regal–Beloit sought, and continues to seek, "a temporary restraining order, preliminary injunction, and permanent injunction enjoining defendants, Drecoll, Rosmonowski, and Palmer, and each of them, and any persons or entities acting in concert with them or conspiring with them, from directly or indirectly, for themselves or on behalf of others, acquiring any interest in Brad Foote Gear Works, Inc. or in its assets or property." (6/18/96 Complaint, pp. 13, 15.)

On June 20, 1996, this Court denied Regal–Beloit's initial request for a temporary restraining order based on the parties' agreement to maintain the *status quo* pending the outcome of a preliminary injunction hearing. On June 21, 1996, the Court referred the case to Magistrate Judge Morton Denlow pursuant to Local General Rule 2.41(b) for an expedited hearing on Regal–Beloit's request for a preliminary injunction. The hearing, which involved the examination of ten witnesses and the presentation of numerous exhibits, was conducted by Magistrate Judge Denlow on June 24–26, 1996. On June 27, 1996, Magistrate Judge Denlow issued his oral recommendation, and, immediately thereafter, this Court entered a temporary restraining order maintaining the status quo pending the parties' submission of objections to the Magistrate Judge's report pursuant to fed. R. Civ. P. 72.

Now before this Court are Magistrate Judge Denlow's Proposed Findings of Fact and Conclusions of Law (hereinafter the "Report"), as contained in the edited transcript of the June 27, 1996 proceedings, in which Magistrate Judge Denlow (1) finds that Regal–Beloit likely will succeed on the merits of its breach of fiduciary duty/usurpation of corporate opportunity claims against the Individual Defendants; (2) determines that Regal–Beloit will suffer irreparable and noncompensable injury if the Individual Defendants are permitted to acquire Brad Foote at this time; and (3) recommends that the Individual Defendants be preliminarily enjoined from consummating their purchase agreement with Brad Foote for six months or until a full trial on the merits can be held, whichever is sooner. The parties have filed various objections to the Magistrate Judge's Report.

## I. *STANDARDS FOR REVIEWING THE MAGISTRATE JUDGE'S REPORT*

Section 636(b)(1)(B) of Title 28 authorizes a district court to refer a matter to a magistrate judge to conduct an evidentiary hearing. Following this hearing, the magistrate judge cannot enter a final judgment, but must submit to the district court proposed findings of fact and recommendations for disposition, to which either party may file written objections within 10 days. 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b). The district court is required to conduct a *de novo* review of those portions of the magistrate judge's report and recommendations to which objections have been filed. This *de novo* review is not the same as a de novo hearing, however. The district court is not required to conduct another hearing to review the magistrate judge's findings and credibility determinations. *United States v. Raddatz,* 447 U.S. 667, 675, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980); *Goffman v. Gross,* 59 F.3d 668, 671 (7th Cir.1995); *United States v. Severson,* 49 F.3d 268, 273 (7th Cir.1995). Rather, the district court has discretion to "accept, reject, modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72(b). If the district court finds a problem, it may take additional evidence, call witnesses, or remand to the magistrate judge for further development. *Raddatz,* 447 U.S. at 675, 100 S.Ct. at 2412. But if following a review of the record the district court is satisfied with the magistrate judge's findings and recommendations it may in its discretion treat those findings as its own. *Id.* at 676, 100 S.Ct. at 2412–13.

Here, the Court's *de novo* review of the record, including the testimonial and documentary evidence relevant to Regal–Beloit's, Brad Foote's, and/or the Individual Defendants' objections; exhaustive examination of the pertinent legal authorities; and comprehensive analysis of the Report reveals Magistrate Judge Denlow's findings of fact and conclusions of law to be, for the most part, eminently reasonable, fundamentally sound and entirely satisfactory.

## II. *THE PARTIES AND THE PURSUIT OF BRAD FOOTE*

Regal–Beloit is a Wisconsin corporation with its principal place of business at 200 South State Street, Beloit, Wisconsin. Regal–Beloit was and is a leading manufacturer of power transmission systems and perishable, high-speed, steel rotary cutting tools. Regal–Beloit's business has expanded significantly in recent years; much of its growth attributable to its business strategy of acquiring and integrating competitors and other companies. Regal–Beloit presently has roughly 2,600 employees and approximately $295 million in sales.

Foote–Jones/Illinois Gear ("Illinois Gear"), which is located in Chicago, Illinois, is an operating division of Regal–Beloit. Illinois Gear manufactures and sells loose gears, parts and enclosed gear drives for a variety of uses, including material handling, aggregate production and general industrial purposes. In 1995, Illinois Gear had roughly 280 employees and net sales of approximately $33 million.

Drecoll is a resident of Naperville, Illinois who was employed by Regal–Beloit from 1981 until 1996. Specifically, from 1987 to June 7, 1996, the date of his resignation, Drecoll was the Vice President and General Manager of Illinois Gear. As found by Magistrate Judge Denlow, Drecoll had total profit and loss responsibility for Illinois Gear and was one of six executives relied upon by Regal–Beloit to set strategy for the power transmission group—a group for which Drecoll assisted in a number of acquisitions. Drecoll was the highest paid of Regal–Beloit's vice presidents and, indeed, was Regal–Beloit's fifth highest paid employee at the time of his resignation.

Palmer is a resident of Downers Grove, Illinois who was employed by Regal–Beloit from October 2, 1989 to June 7, 1996. Palmer was the manufacturing manager of Illinois Gear; he reported directly to Drecoll.

Rosmonowski is a resident of Carol Stream, Illinois who worked for Regal–Beloit as the national sales and marketing manager of Illinois Gear from May 5, 1989 to June 7,

1989. Like Palmer, Rosmonowski reported directly to Drecoll.

Brad Foote is a Delaware corporation with its principal place of business at 1309 South Cicero Ave, Chicago, Illinois. Brad Foote is in the same line of business as Illinois Gear; the two businesses manufacture similar products and compete for the same customers. Defendant Stewart Ward ("Ward") is the President and 40% owner of Brad Foote; Defendant Michael Iglar ("Iglar") is the Treasurer of Brad Foote and owns 20% of the company.

Since 1990, Regal–Beloit has been extremely interested in acquiring Brad Foote. Regal–Beloit believed, and continues to believe, that acquiring Brad Foote would (1) afford Illinois Gear the majority market position for spiral beval gears over 30"; (2) provide Illinois Gear with a proprietary capability for induction hardening large course pitch gearing; and (3) result in significant economies with respect to Illinois Gear's manufacturing, marketing and purchasing functions. In short, Regal–Beloit viewed, and still views, the acquisition of Brad Foote as a desirable business strategy.

Regal–Beloit has embarked on a long and unyielding road to implement this strategy. On April 27, 1990, Henry Knueppel ("Knueppel"), Regal–Beloit's Executive Vice President and a member of Regal–Beloit's Board of Directors, sent Ward a letter indicating Regal–Beloit's interest in being "able to work closer together." (Pl.Ex. 1.) Over the next two-and-a-half years, Regal–Beloit and Brad Foote exchanged correspondence in which both companies expressed their potential interest in pursuing a deal for Brad Foote to become part of the Regal–Beloit family. (Pl. Exs.2, 3, 4, 5.)

On January 6, 1994, Regal–Beloit sent Brad Foote a letter stating, "I think that by putting our businesses together, we can have a very successful operation that will be good for all concerned." (Pl.Ex. 7.) With that letter, Regal–Beloit also forwarded to Brad Foote a signed Confidentiality Agreement that was entered into "with a view to establishing whether there is any basis for the purchase of the business [Brad Foote] by [Regal–Beloit]." (Pl.Ex. 8.) Following the execution of the Confidentiality Agreement, Brad Foote provided Regal–Beloit with confidential information concerning Brad Foote's operations.

On March 21, 1995, Regal–Beloit sent Brad Foote a letter indicating "a continuing interest in working with [Ward] and Paul [Siepel], and I am hopeful 1995 will be the year in which we finally accomplish [Regal–Beloit's acquisition of Brad Foote]." (Pl.Ex. 10.)

In May 1995, Bell Helicopter settled a product liability suit that it had filed against Brad Foote. The pendency of this lawsuit previously had prevented Regal–Beloit from taking definitive steps towards acquiring Brad Foote. Consequently, following the Bell Helicopter settlement, Brad Foote and Regal–Beloit began serious acquisition discussions.

On July 13, 1995, Knueppel and Drecoll visited Brad Foote's plants in Pittsburgh, Pennsylvania and Cicero, Illinois to evaluate Brad Foote's operations and equipment. Drecoll accompanied Knueppel on these visits because of Regal–Beloit's ultimate plan to merge Illinois Gear's and Brad Foote's Illinois operations and to give Drecoll full responsibility for running both the combined Illinois enterprise and the Pittsburgh facility.

Following Drecoll's and Knueppel's plant visits, Regal–Beloit conveyed to Ward an oral offer to purchase Brad Foote. In a July 24, 1995 letter, Ward responded to this offer by requesting a written proposal from Regal–Beloit. (Pl.Ex. 11.)

On August 2, 1995, Regal–Beloit sent Brad Foote a Letter of Intent containing a formal offer to purchase Brad Foote. (Pl.Ex. 13.) On August 11, 1995, Brad Foote sent Regal–Beloit a letter stating, "There is so much value that could be obtained by a combination of our companies that I think it would be well worth our continuing discussions." (Pl. Ex. 14.) Over the next month, the two companies discussed a variety of issues, including inventory, receivables, and other matters. Regal–Beloit began its "due diligence" review of Brad Foote's equipment, account receivables, and environmental policies.

On September 15, 1995, Regal–Beloit sent Brad Foote a letter stating, "Please accept this letter as our Statement of Intent to Negotiate and consummate the purchase of assets from Brad Foote Gear Works, Inc./Pittsburgh Gear Company (collectively 'BFGW') of its Products comprised of course gearing, speed reducers, custom gearing and enclosed drivers (the 'Products') and other selected assets associated with the Products." (Pl.Ex. 18.) On September 18, 1995, Brad Foote sent Regal–Beloit a fax containing proposed changes to Regal–Beloit's Statement of Intent to Negotiate. (Pl.Ex. 19.)

On September 19, 1995, Brad Foote and Regal–Beloit executed a formal Letter of Intent, and, soon thereafter, Regal–Beloit issued a press release announcing the commencement of negotiations for Regal–Beloit's purchase of Brad Foote. (Pl.Exs.20, 21.)

During the ensuing negotiation period, Drecoll, as future manager of the combined Illinois Gear/Brad Foote enterprise, was often consulted by Knueppel and was actively involved in Regal–Beloit's "due diligence" review of Brad Foote. Indeed, on October 10 and 11, 1995, Drecoll, acting on behalf of Regal–Beloit, again visited Brad Foote's Cicero and Pittsburgh plants to evaluate equipment and to assist Knueppel in formulating a strategy for advantageously integrating Regal–Beloit's and Brad Foote's operations.

In early October 1995, Regal–Beloit management prepared an acquisition analysis for submission to the Regal–Beloit Board of Directors. This document contained Regal–Beloit management's evaluation of Brad Foote, their recommendation to proceed with the acquisition, and an operating plan detailing potential steps/moves to be taken by Regal–Beloit with respect to Brad Foote's operations to obtain the maximum benefit from the purchase. (Pl.Ex. 23.) Drecoll assisted in preparing and reviewing this report.

On October 18, 1995, Regal–Beloit's Board of Directors held a special meeting to consider the aforementioned acquisition analysis. The Board authorized the proposed acquisition "in an approximate amount of $10,000,-000" and directed management to negotiate a definitive agreement. (Pl.Ex. 24.)

Thereafter, Brad Foote and Regal–Beloit exchanged a series of draft Agreements of Sale and proposed Lease Agreements for Brad Foote's Cicero plant. (Pl.Exs.25, 26, 27, 30.) In the course of negotiations, Brad Foote was notified that Regal–Beloit wished to delay the sale until after the completion of Regal–Beloit's scheduled April 1996 union negotiations, so as to avoid potential problems concerning the seniority rights of Brad Foote employees following consolidation of the two companies. Drecoll was to be involved in the union negotiations and was instructed to work out certain provisions in the union contract to facilitate a smooth integration of Brad Foote's and Illinois Gear's operations.

On November 3, 1995, Brad Foote sent Regal–Beloit a letter terminating Brad Foote's discussions with Regal–Beloit. This letter offered no specific reason for Brad Foote's decision not to sell to Regal–Beloit; it merely stated that "recent terms proposed by Regal–Beloit are unacceptable to us and indicate that further discussions of those issues would not be productive." (Pl.Ex. 31.) At the evidentiary hearing before Magistrate Judge Denlow, the following reasons were given for Brad Foote's November 1995 termination decision:

(1) Regal–Beloit's refusal to take over Brad Foote's existing leases or to provide appropriate subleasing that would have relieved Brad Foote's owners of contingent liabilities they wished to avoid with the sale;

(2) Regal–Beloit's change in position from the Letter of Intent regarding inventory—that is, Regal–Beloit's insistence that Brad Foote adjust its method for valuing its inventory in order to reduce the selling price;

(3) Regal–Beloit's insistence that Ward open talks with Brad Foote's union to get a succession clause dropped from the contract;

(4) Ward's lack of satisfaction with Regal–Beloit's assertions as to the post-sale handling of warranty issues—ward and the other owners remaining responsible for

warranties that they could no longer satisfy;

(5) Regal–Beloit's refusal to pick up an insurance policy on retirees and its request that Brad Foote buy out the policy for $50,000 to $60,000; and

(6) Ward's and Iglar's overall lack of trust in the people at Regal–Beloit.

On November 7, 1995, Knueppel sent the owners of Brad Foote a letter indicating his disappointment at their decision and expressing Regal–Beloit's continuing desire to acquire Brad Foote. This letter also acknowledged Regal–Beloit's obligation to return Brad Foote's materials pursuant to the previously executed Confidentiality Agreement. (Pl.Ex. 32.) Ward never responded to this letter.

Soon thereafter, Knueppel spoke with Ward, explained that Regal–Beloit remained interested in purchasing Brad Foote, and indicated that Regal–Beloit wished to renew negotiations with Brad Foote following the favorable renegotiation of Regal–Beloit's union contract.

On November 14–15, 1995, both Regal–Beloit and Brad Foote issued press releases announcing that "formal negotiations" between Brad Foote and Regal–Beloit had ended. (Pl.Exs.34, 66.)

On November 27, 1995, James Packard ("Packard"), Regal–Beloit's President, Chief Executive Officer and Chairman of the Board of Directors, visited Illinois Gear accompanied by Knueppel. Packard and Knueppel met with Drecoll, Rosmonowski, Palmer and other Illinois Gear managers and advised these managers that Regal–Beloit still expected to acquire Brad Foote and that Regal–Beloit intended to negotiate its union contract in a manner that would allow consolidation of the Illinois Gear and Brad Foote work forces.

In early-December 1995, Ward called Knueppel and requested that Regal–Beloit return the confidential materials provided by Brad Foote for purposes of facilitating the proposed acquisition. At Knueppel's request, however, Ward agreed to maintain the materials for possible use after Regal–Beloit's labor issues were resolved.

On December 20, 1995, Ward contacted Drecoll to discuss a mutual problem pertaining to certain fan blades and requested to meet with Drecoll at the Illinois Gear facility. During that meeting, Ward indicated to Drecoll that he no longer trusted Regal–Beloit and that he and the other owners of Brad Foote were exploring the possibility of selling their interests through an Employee Stock Option Plan ("ESOP"). Under this ESOP, the principals of Brad Foote would have sold approximately 30 percent of their ownership interest in Brad Foote for cash—cash to be funded by a bank loan secured by stock and to be repaid from Brad Foote's revenue. Yet, significantly, the bank with which Brad Foote's owners were dealing indicated the need for adequate management succession.

Ward was, and is, anxious to sell his interest in Brad Foote and retire, as he had recently suffered a heart attack and had been advised by his doctor to stop working. Iglar was, and is, similarly anxious to retire, having recently suffered a stroke.

On January 16, 1996, Drecoll met with Ward at Brad Foote to discuss the possibility of Drecoll's participation in the ESOP. Drecoll indicated his interest in possible participation and scheduled a second meeting with Ward for late-January to discuss the matter further.

Following the January 16 meeting, Drecoll researched ESOPs and concluded that he was not interested in pursuing that financing option. Thus, at his second meeting with Ward at Brad Foote, Drecoll inquired as to whether Ward and the other owners would entertain an offer from Drecoll to purchase Brad Foote for $6 million—$2 million to be paid up front and $4 million to be paid, without interest, over a 10 year period. Ward indicated that, if Drecoll could arrange for financing, the deal could be done. Ward further advised Drecoll that, while he received occasional telephone calls from Regal–Beloit representatives interested in pursuing a deal, Ward was not interested in selling, and would not sell, Brad Foote to Regal–Beloit. Indeed, in January 1996, Knueppel called Ward to indicate Regal–Beloit's contin-

ued interest in purchasing Brad Foote and was informed by Ward that Brad Foote was considering an ESOP.

At about this time, Drecoll approached Rosmonowski and Palmer about joining him in purchasing Brad Foote; Palmer and Rosmonowski agreed, and the alleged conspiracy was born. Under the terms of the proposed deal, Drecoll will have an 80% interest in Brad Foote, while Palmer and Rosmonowski will each have a 10% interest.

On February 6, 1996, Drecoll visited Regal–Beloit headquarters in Wisconsin and met with Packard. Packard informed Drecoll of Regal–Beloit's continuing interest in Brad Foote. Drecoll mentioned neither his recent conversations with Ward nor his intention to purchase Brad Foote with Palmer and Rosmonowski.

In mid-February 1996, Drecoll and his attorney, John Pembroke ("Pembroke"), prepared a business plan to be used by Drecoll in determining whether his proposed purchase of Brad Foote was bankable.[1] This plan included a comparison of Brad Foote's financial data with that of "Competitor A"—a competitor whose financial and other data was identical to Illinois Gear's unpublished data. The plan also stated, "Recently, Mr. Drecoll identified an opportunity to purchase a direct competitor to his employer, and had submitted that opportunity to his employer for consideration. While the employer declined to pursue the opportunity further, Mr. Drecoll believes that such a great potential exists for this project that he is pursuing it independently." (Pl.Ex. 49.) Yet, Drecoll, by his own admission, never did notify Regal–Beloit of his opportunity and intention to purchase Brad Foote, and Regal–Beloit certainly did not decline the opportunity to acquire Brad Foote.

In late-February or early-March 1996, Ward notified Drecoll that Brad Foote could not proceed with the deal because of an accounting problem. In the ensuing months, Drecoll resolved to resurrect, and eventually succeeded in resurrecting, the stalled purchase arrangement.

On March 23, 1996, Drecoll again met with Packard, who reiterated to Drecoll the importance of including a provision in the soon-to-be-negotiated union contract that would allow for the smooth consolidation of Brad Foote's and Illinois Gear's operations; and, in fact, the collective bargaining agreement eventually negotiated and signed by Drecoll and Palmer on behalf of Regal–Beloit in mid-April 1996 contained a clause specifically authorizing Regal–Beloit to grant seniority to Brad Foote employees in the event of a merger of the two companies' work forces. (Pl.Ex. 35.)

Packard and Drecoll met once more on April 23, 1996. At this meeting, which took place shortly before a scheduled Regal–Beloit Board of Directors' meeting, Packard apparently specifically asked Drecoll whether Drecoll thought Regal–Beloit's acquisition of Brad Foote would be feasible and/or profitable, whether Drecoll believed the Brad Foote and Illinois Gear operations could be consolidated quickly, and whether Drecoll felt that Regal–Beloit's pursuit of Brad Foote was a "good idea." Drecoll responded that, in his opinion, Regal–Beloit's acquisition of Brad Foote was a good idea, that such an acquisition could be successfully accomplished by Regal–Beloit, and that he could handle the consolidation of the two companies' operations. According to Drecoll, "We [Regal–Beloit] can make a lot of money doing this." (Trans. p. 211–12.) At no time during this meeting did Drecoll indicate to Packard or to Knueppel (1) that Drecoll himself was presently in negotiations to purchase Brad Foote or (2) that Ward had informed Drecoll that Ward would never sell Brad Foote to Regal–Beloit.[2]

---

1. On February 17, 1996, Pembroke submitted the business plan to Citizen's Banking Corporation, a federally-insured bank located in Elk Grove Village, Illinois.

2. As noted by Magistrate Judge Denlow, at all relevant times, Regal–Beloit maintained a set of policies, procedures and guidelines for its employees, which was widely distributed through the company to key executives and sales personnel. (Pl.Exs.37, 47.) As a vice president and General Manager of Illinois Gear, Drecoll was responsible for enforcing these policies and procedures. One of these guidelines specifically provides: "You should refrain from taking part in or exerting influence in any transaction in which your own interests may conflict with the

Following the Regal–Beloit Board of Directors' meeting, Knueppel and Ward had a telephone conversation in which Knueppel expressed Regal–Beloit's unwavering desire to acquire Brad Foote. During this conversation, Ward mentioned that Brad Foote was sill exploring the possibility of an ESOP.

On April 26, 1996, Knueppel sent Brad Foote a letter attempting to dissuade Brad Foote from pursuing the ESOP and stated that Regal–Beloit remained "very interested in rejuvenating our discussions." (Pl.Ex. 36.) Ward never responded to this letter.

Meanwhile, Drecoll continued in his attempts to purchase Brad Foote, eventually offering Ward and Iglar consulting contracts in an effort to resolve the former "accounting" problems. A deal eventually was struck between Drecoll and the owners of Brad Foote, and Drecoll, Palmer and Rosmonowski obtained the necessary financing commitment.

On June 7, 1996, Drecoll, Palmer and Rosmonowski announced their resignations from Regal–Beloit.

The proposed transaction between the Individual Defendants and Brad Foote was scheduled to close on June 28, 1996. Pursuant to the temporary restraining order issued by this Court on June 27, 1996 pending submission and review of Brad Foote's, Regal–Beloit's and the Individual Defendants' various objections to Magistrate Judge Denlow's Report, the closing did not occur as scheduled and has not occurred to date. Further, the Individual Defendants' financing commitment expired on July 1, 1996.

### III. *REGAL–BELOIT IS ENTITLED TO A PRELIMINARY INJUNCTION*

Regal–Beloit asserts in its Complaint that, as employees and as managers of Regal–Beloit and Illinois Gear, the Individual Defendants breached, and continue to breach, their fiduciary duties of loyalty and confidentiality to Regal–Beloit by (1) competing directly with Regal–Beloit for the acquisition of Brad Foote; (2) improperly utilizing Regal–Beloit's confidential financial and other data pertaining to the proposed acquisition of

Brad Foote; and (3) usurping a "corporate opportunity" of Regal–Beloit's by attempting to acquire Brad Foote without first disclosing to Regal–Beloit all pertinent facts relating to Brad Foote's unwillingness to sell to Regal–Beloit and to the Individual Defendants' desire to purchase Brad Foote for themselves. In light of the alleged impropriety of the Individual Defendants' past and likely future conduct, Regal–Beloit seeks a preliminary injunction barring the Individual Defendants from proceeding with their proposed acquisition of Brad Foote.

Preliminary injunctive relief is appropriate only where the party seeking such relief can show (1) that it is likely to succeed on the merits of its claim/s, (2) that it will suffer irreparable harm if the injunction is not granted, and (3) that it possesses, and will possess, no adequate remedy at law. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 313 (7th Cir.1994). "If these conditions are met, then the court must balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently. . . . In addition, the court must consider the public interest in whether the injunction is to be granted or denied." *Id.* at 314. Here, Regal–Beloit has established all of the elements necessary for the issuance of a preliminary injunction, and the balance of harms as well as the public interest weigh in favor of granting Regal–Beloit temporary injunctive relief.

> A. *Regal–Beloit is Likely to Succeed on the Merits of its Breach of Fiduciary Duty/Usurpation of "Corporate Opportunity" Claims*

1. The Individual Defendants owe Regal–Beloit a Fiduciary Duty of Loyalty with Respect to the Potential Acquisition of Brad Foote

■ It is a well-established common law principle that corporate officers and directors owe a fiduciary duty of utmost good faith and loyalty to their corporations. *See Racine v. Weisflog*, 165 Wis.2d 184, 477 N.W.2d 326, 329 (1991); *General Automotive Mfg. Co. v. Singer*, 19 Wis.2d 528, 120 N.W.2d 659, 662 (1963). Under controlling Wisconsin law,

best interests of Regal–Beloit Corporation as a whole."

this duty of good faith and loyalty is not limited to managers and board members, however.[3] Rather, all employees owe their employers a fiduciary duty of loyalty with respect to any and all matters within the scope of their agency. *Mitchell v. Sherman,* 1996 WL 251503, at *4 (Wis.Ct.App. May 14, 1996); *Arsand v. Franklin,* 83 Wis.2d 40, 264 N.W.2d 579, 584 (1978). As explained by the court in *Bank of California v. Hoffmann,* 255 Wis. 165, 38 N.W.2d 506 (1949):

> It is well settled that an agent is a fiduciary with respect to all matters within the scope of his agency. The very relation implies that the principal has reposed some trust or confidence in the agent. Therefore, the agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer. He is duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto. His duty is to act solely for the benefit of the principal in all matters connected with his agency. This is a rule of common sense and honesty as well as of law.

*Id.* 38 N.W.2d at 509.

■■■■ Here, even if the Individual Defendants are not deemed to be officers of Regal–Beloit—a conclusion which is specious, at best, given (1) Drecoll's well-paid position of considerable responsibility at Regal–Beloit generally and at Illinois Gear specifically, and (2) Palmer's and Rosmonowski's positions of authority at Illinois Gear as well as their participation with Drecoll in the alleged conspiracy[4]—, as employees, they still owe Regal–Beloit fiduciary duties of loyalty as to all matters within the scope of their employment. Such matters undoubtedly included the acquisition of Brad Foote.

Drecoll was tapped by Regal–Beloit to be the person responsible for running both the combined Illinois enterprise and the Pittsburgh facility following the proposed purchase and integration of Brad Foote. Drecoll was actively involved in the due diligence review of Brad Foote's operations and equipment—having taken two trips with Knueppel to Brad Foote's facilities—; and he aided in the preparation and review of the Brad Foote acquisition analysis submitted to Regal–Beloit's Board of Directors. Drecoll was often consulted by Knueppel and Packard as to his opinions of Regal–Beloit's proposed purchase of Brad Foote as well as his recommendations for efficiently consolidating the two companies' operations; and he and Palmer personally were charged with the responsibility of negotiating the union contract in a manner that would permit the smooth merging of Brad Foote's and Regal–Beloit's work forces. In short, the evaluation, negotiation and implementation of Regal–Beloit's proposed purchase of Brad Foote were well within the scope of the Individual Defendants', and particularly Drecoll's, employment, and, accordingly, the Individual Defendants' owed, and continue to owe, Regal–Beloit a duty of undivided loyalty and good faith with respect to that purchase.

2. **The Individual Defendants' Attempted Purchase of Brad Foote Likely is an Unlawful Diversion of Regal–Beloit's "Corporate Opportunity"**

■■ In *Gauger v. Hintz,* 262 Wis. 333, 55 N.W.2d 426 (1952), the Supreme Court of

---

**3.** The established rule of conflicts law is that "[t]he corporate law of the state of incorporation is controlling with respect to the fiduciary duties fits directors as well as other internal corporate affairs." *Treco, Inc. v. Land of Lincoln Savings & Loan,* 749 F.2d 374, 377 (7th Cir.1984). Here, Regal–Beloit is a Wisconsin corporation, and, thus, Wisconsin law governs Regal–Beloit's various fiduciary duty claims. The Court need not, and does not, determine whether Wisconsin law similarly applies to Regal–Beloit's trade secret and other, non-fiduciary duty claims.

**4.** Under Wisconsin law, a civil conspiracy is defined "as a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful." *Radue v. Dill,* 74 Wis.2d 239, 246 N.W.2d 507, 509 (1976). Where the conspiracy itself has an unlawful purpose, the means employed, whether themselves criminally or civilly actionable, are immaterial. *Id.* 246 N.W.2d at 510–11. Acts which are not actionable when committed alone may be wrongful when done in combination and in furtherance of a conspiracy. *Id.; Mitchell,* 1996 WL 251503, at *3. Thus, because there is no dispute as to the fact that Palmer and Rosmonowski agreed to join with Drecoll in his attempt to purchase Brad Foote, Regal–Beloit is likely to succeed on its conspiracy claim and Palmer and Rosmonowski may be held liable for Drecoll's breach of his fiduciary duty as an officer of Regal–Beloit.

Wisconsin laid the foundation for the doctrine of "corporate opportunity." The essential principle underlying this doctrine is that "[o]ne who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence." *Id.* 55 N.W.2d at 435–36. The doctrine derives "'from fundamental rules of agency concerning the duty of utmost good faith and loyalty owed by a fiduciary to his principal and also from the law of constructive trusts embodying equitable principals of unjust enrichment.'" *Racine,* 477 N.W.2d at 329 (quoting *Miller v. Miller,* 301 Minn. 207, 222 N.W.2d 71, 78 (1974)).

▪ The initial burden of proving the existence of a corporate opportunity rests upon the party—here, Regal–Beloit—challenging the conduct of the corporate fiduciary/ies. *Racine,* 477 N.W.2d at 331. The following factors are considered and weighed in determining the existence of a corporate opportunity:

(1) whether the business opportunity presented is one in which the complaining corporation has an interest or an expectancy growing out of an existing contractual right;

(2) the relationship of the opportunity to the corporation's business purposes and current activities—whether essential, necessary, or merely desirable to its reasonable needs and aspirations—;

(3) whether, within or without the corporation's powers, the opportunity embraces areas adaptable to the corporation's business and into which the corporation might easily, naturally, or logically expand;

(4) the competitive nature of the opportunity—whether prospectively harmful or unfair;

(5) whether the corporation, by reason of insolvency or lack of resources, has the financial ability to acquire the opportunity; and

(6) whether the opportunity includes activities as to which the corporation has fundamental knowledge, practical experience, facilities, equipment, personnel, and the ability to pursue.

*See Id.* at 331; *Miller,* 222 N.W.2d at 81. "An examination of the *totality* of these factors on balance will reveal the true position of a corporation relative to the presented opportunity and will determine whether a corporate opportunity in fact existed ..." *Racine,* 477 N.W.2d at 331 (emphasis added).

▪ In the present matter, while Brad Foote and the Individual Defendants are correct that Regal–Beloit did not, and does not, possess an interest or an expectancy in acquiring Brad Foote growing out of an existing contractual right, an examination and consideration of *all* the relevant factors pertaining to Regal–Beloit's proposed purchase of Brad Foote reveals that potential purchase to be a true "corporate opportunity" of Regal–Beloit's.

The acquisition of Brad Foote was, and is, extremely desirable to Regal–Beloit given the apparent synergies between Brad Foote's and Illinois Gear's product lines and customer bases and the potentially significant economies in manufacturing, marketing and purchasing to be gained by Regal–Beloit from a consolidation of the Illinois Gear and Brad Foote operations. Further, it is indisputable that Regal–Beloit had, and continues to have, the financial ability, practical experience, personnel, and organizational willingness to purchase Brad Foote and to merge Brad Foote's work force, equipment and facilities with its own. Thus, as the proposed acquisition of Brad Foote was, and is, "'reasonably incident to [Regal–Beloit's] present or prospective business and is one in which the corporation has the capacity to engage,'" *Havlicek/Fleisher Enterprises, Inc. v. Bridgeman,* 788 F.Supp. 389, 398 (E.D.Wis.1992)(quoting 3 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 861.1, p. 286 (1986)), that possible acquisition was, and is, a corporate opportunity of Regal–Beloit's which could not, and cannot, be usurped by the Individual Defendants without Regal–Beloit's authorization—authorization given with full knowledge of all material facts.

Given that the evidence presented to the Magistrate Judge supports the conclusion that the purchase of Brad Foote was, and is,

a corporate opportunity, the burden of proof rests on the Individual Defendants to prove that their attempts to purchase Brad Foote for themselves did not breach their fiduciary duties of loyalty. *Racine*, 477 N.W.2d at 331. The Individual Defendants are unlikely to be able to satisfy this burden.

The Individual Defendants contend primarily that their pursuit of Brad Foote did not violate their fiduciary obligations to Regal–Beloit, as Regal–Beloit "was unable to take advantage of the opportunity...." *Havlicek/Fleisher*, 788 F.Supp. at 399. In support of this contention, the Individual Defendants and Brad Foote point to two related facts: (1) formal negotiations between Brad Foote and Regal–Beloit were terminated in November 1995 and were never renewed by Ward or the other owners of Brad Foote, and (2) Ward and Brad Foote refused, and continue to refuse, ever to sell Brad Foote to Regal–Beloit. Yet, regardless of their truth or falsity, neither of these two facts is sufficient to undermine the conclusion that Regal–Beloit is likely to succeed on the merits of its breach of fiduciary duty/usurpation of corporate opportunity claims.

Initially, the mere fact that negotiations between Brad Foote and Regal–Beloit terminated in November 1995 and were never renewed does not suggest either that Regal–Beloit rejected the corporate opportunity or that Regal–Beloit was unable to take advantage of the opportunity. Indeed, a similar argument was rejected by the court in *Lindenhurst Drugs, Inc. v. Becker*, 154 Ill. App.3d 61, 106 Ill.Dec. 845, 506 N.E.2d 645 (1987).

In *Lindenhurst*, the defendant, the director of a corporation that operated a shopping mall drugstore, made an offer to purchase a competing drug store on behalf of the corporation. This offer was rejected. The corporation did not make another offer to purchase the competing store for more than two years, although the defendant-director was aware that the corporation remained interested in acquiring the rival pharmacy. The defendant-director eventually purchased the competing drug store through his own, newly-formed company without first notifying his corporation of his intent to do so and without informing his corporation of a number of material facts which likely would have prompted the corporation to make a new offer to acquire the competing store. In finding the defendant liable for breaching his fiduciary duties to the corporation, the *Lindenhurst* court specifically rejected the defendant's contention that the corporate opportunity "later became an individual opportunity because of plaintiff's failure to pursue the opportunity." *Id.* 106 Ill.Dec. at 850, 506 N.E.2d at 650. The court explained:

> Here, it is undisputed that plaintiff remained interested in purchasing the Ben Franklin store franchise, and there was no evidence presented that plaintiff was unwilling to pay the price James Schmuck was asking for the franchise. Defendant argues that plaintiff's extremely low offer suggests that they were unwilling to pay a higher price. The testimony, however, indicated that the low offer was made because plaintiff was in no hurry to buy the store as it still had 2½ years left on its lease, and the directors didn't think anyone else was interested.... There was no evidence presented here to indicate that plaintiff would not have met James Schmuck's asking price at the time defendant began negotiations on his own.

> \* \* \* \* \* \*

> [D]efendant's fiduciary duties to the corporation required him to promptly inform the other directors that the lease was not being renewed and to disclose to the corporation that City Products was willing to negotiate for the sale of the Ben Franklin store if the price James Schmuck was asking was met. Plaintiff would then have had the opportunity to make the decision based upon the pertinent facts. After this disclosure, if the corporation failed to act, defendant certainly could have taken the opportunity for himself.

*Id.* at 851, 852, 506 N.E.2d at 651, 652; *see also Comedy Cottage, Inc. v. Berk*, 145 Ill. App.3d 355, 99 Ill.Dec. 271, 495 N.E.2d 1006 (1986).

Here, Regal–Beloit, like the plaintiff-corporation in *Lindenhurst*, remained extremely

interested in purchasing Brad Foote, even after its first acquisition attempt was unsuccessful. Indeed, there is ample evidence to suggest that, had Regal–Beloit been informed by Drecoll, Palmer or Rosmonowski of (1) the fact that Brad Foote still was actively seeking a buyer and/or (2) the nature of Brad Foote's problems and/or displeasure with Regal–Beloit's initial offer, Regal–Beloit would have considered modifying its terms and adjusting its position on warranty, insurance, union and other issues in order to accommodate Brad Foote's concerns. Yet, like the *Lindenhurst* defendant, Drecoll, Palmer and Rosmonowski failed to present Regal–Beloit with all of the pertinent facts known to them and failed to notify Regal–Beloit that they were attempting to purchase Brad Foote for themselves. This lack of candor, by itself, likely constitutes a violation of the corporate opportunity doctrine:

> [I]f the doctrine of business opportunity is to possess any vitality, the corporation or association must be given the opportunity to decide, upon full disclosure of the pertinent facts, whether it wishes to enter into a business that is reasonably incident to its present or prospective operations. If directors fail to make such a disclosure and to tender the opportunity, the prophylactic purposes of the rule imposing a fiduciary obligation requires that the directors be foreclosed from exploiting that opportunity on their own behalf.

*Kerrigan v. Unity Savings Ass'n*, 58 Ill.2d 20, 317 N.E.2d 39, 43–44 (1974)(as quoted in *Lindenhurst*, 106 Ill.Dec. at 850, 506 N.E.2d at 650).[5]

Moreover, the fact that Ward and Iglar—together 60% owners of Brad Foote—expressed to the Individual Defendants (and, indeed, to the Magistrate Judge) their dis-

trust for Regal–Beloit management and their resulting refusal ever to sell Brad Foote to Regal–Beloit does not relieve Drecoll, Palmer and Rosmonowski of liability for pursuing Brad Foote for themselves without first disclosing all material facts—including Ward's and Iglar's refusal to deal with Regal–Beloit—to the disinterested officers and directors of Regal–Beloit. A number of courts have found corporate fiduciaries liable for diverting business opportunities even where those opportunities were, in fact, unavailable to the corporation by virtue of a third-party's refusal to deal with the corporation.

In *Energy Resources Corp., Inc. v. Porter*, 14 Mass.App.Ct. 296, 438 N.E.2d 391 (1982), for example, the defendant, a vice president of the plaintiff-corporation, had been involved in discussions, on behalf of the corporation, with a professor at Howard University for the submission of proposal for a government grant. The professor eventually informed the defendant that, for a variety of reasons, he didn't trust the plaintiff-corporation and that he would refuse to submit the proposal in conjunction with the plaintiff-corporation; the professor indicated that he would be interested in submitting the proposal with the defendant alone, however. The defendant ceased working on the proposal at the corporation—ostensibly to avoid any conflict of interest—but failed to inform the corporation of the professor's refusal to deal with them. The defendant ultimately left the corporation and submitted a successful grant proposal with the professor. In finding the defendant liable for diverting the corporate opportunity, the *Energy Resources* court specifically rejected the argument that, since the professor refused to deal with the corporation, the corporation was unable to avail

---

5. Brad Foote's and the Individual Defendants' argument that Drecoll, Palmer and Rosmonowski did not need to inform Regal–Beloit of the opportunity to purchase Brad Foote because Regal–Beloit already was well aware of that opportunity is both legally and factually unpersuasive. A fiduciary's disclosure obligations pertain not only to the existence of a corporate opportunity, but also to any facts which may be pertinent to the corporation's ability and/or willingness to seize upon that opportunity. Here, while Defendants are correct that Regal–Beloit was cogni-

zant of the benefits of acquiring Brad Foote, Regal–Beloit was not aware of the particular reasons for Brad Foote's unwillingness to sell to Regal–Beloit and had no knowledge that its own managers were attempting to purchase Brad Foote for themselves. Because these facts unquestionably were relevant to, and likely would have affected, Regal–Beloit's analysis of, and approach to, the purchase of Brad Foote, the Individual Defendants were obligated immediately to disclose these facts to Regal–Beloit.

itself of the opportunity and the defendant was, therefore, free to exploit it:

It [the refusal-to-deal defense] was a defense which the trial judge thought convincing: "[N]o amount of persuasion," he wrote, "could alter Dr. Jackson's resolve that the subcontractor be a minority concern." [The defendant] was not to be asked for "performance of fiduciary duty even to the point of futility." The difficulty with the judge's reasoning is that the unalterability of Jackson's resolve can by no means be certain so long as [the defendant], by keeping Jackson's position and his reasons for it a secret, never afforded [the plaintiff-corporation] a chance to test it. Had [the defendant] told [the plaintiff-corporation] about Howard University's desire (as manifested by Jackson) to deal with a subcontractor controlled by persons who were black, the matter might have taken a variety of turns.

*Id.* 438 N.E.2d at 394. The court continued:

For the reason that the firmness of a refusal to deal cannot be adequately tested by the corporate executive alone, it has not been favored as a defense unless the refusal has first been disclosed to the corporation. Without full disclosure it is too difficult to verify the unwillingness to deal and too easy for the executive to induce unwillingness.

\* \* \* \* \* \*

We conclude that before a person invokes refusal to deal as a reason for diverting a corporate opportunity he must unambiguously disclose that refusal to the corporation to which he owes a duty, together with a fair statement of the reasons for that refusal.

*Id.* at 394, 395.

In *Production Finishing Corp. v. Shields,* 158 Mich.App. 479, 405 N.W.2d 171 (1987), *cert. denied,* 488 U.S. 955, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988), the court accepted and applied the *Energy Resources* analysis. In *Production Finishing,* the defendant was the President of a steel polishing company whose longstanding objective was to acquire Ford Motor Co.'s steel polishing business. Upon learning that Ford was considering ceasing its polishing operations, the defendant notified the company's Board of Directors of the opportunity and, at the Board's request, contacted Ford with a purchase offer. Upon being informed by Ford that they would not sell to the company because "[the company] would have a monopoly in the area," the defendant inquired as to whether Ford would sell the polishing business to him in his individual capacity. Ford agreed, and the defendant began preparations to purchase the Ford operation for himself, without informing the company that Ford refused to sell to the company and without alerting the company to the fact that he was pursuing the opportunity on his own account. While the *Production Finishing* court recognized that, in fact, Ford was unlikely ever to sell its polishing business to the plaintiff-company, the court refused to absolve the defendant of liability for diverting a corporate opportunity, stating:

We agree with the analysis of the Massachusetts court [in *Energy Resources*] and hold that a third party's purported refusal to deal with a corporation will not relieve a fiduciary from liability when he had failed to disclose the refusal to his principal. The reason behind this rule was set out in Brudney & Clark, A New Look at Corporate Opportunities, 94 Harv. L.Rev. 997, 1021 (1981), as follows:

"[I]f financial disabilities or third-party refusals to deal with the corporation are accepted as tests, the inevitable result will be to permit the diversion. This is true because courts must resolve the legal issues on the basis of a set of facts largely within the control of the diverter."

*Id.* 405 N.W.2d at 175.

Finally, the refusal-to-deal defense was also rejected in *Imperial Group (Texas), Inc. v. Scholnick,* 709 S.W.2d 358 (Tex.Ct.App. 1986). The defendant in *Scholnick,* the corporate officer of a real estate investment group, was found to have usurped the group's corporate opportunity by purchasing for himself a specific tract of land, notwithstanding that the former owner of the land would not have sold it to the group under the same terms and conditions offered to the defendant. The court explained:

A business opportunity, the Pardue transaction, which was well within the scope of the activities and business of Imperial, was presented to Scholnick and as its fiduciary, he had an absolute and unconditional legal and moral duty to disclose that opportunity to Imperial. That is the core and basis of the equitable rule. Courts of equity should not recognize a rule regarding transactions of the character here involved which permits the corporate fiduciary to escape his duty to disclose the opportunity presented by securing an after-the-fact finding by the trier of the facts that the corporation was unable to take advantage of or would have rejected the business opportunity seized by the fiduciary had it been offered. To permit the destruction of a corporate fiduciary's duty to disclose the material facts of any given transaction within the line of his corporation's business by such means necessarily will operate to encourage dishonesty and infidelity on the part of the fiduciary in self-dealing.

*Id.* at 367 (citations omitted); *see also Wartski v. Bedford,* 926 F.2d 11, 13 (1st Cir.1991); *In re Cumberland Farms, Inc.,* 181 B.R. 678, 680 (Bankr.D.Mass.1995); *Neill Corp. v. John Paul Mitchell. Systems,* 1995 WL 381684, at *8 (E.D.La. June 26, 1995); *Graham v. Mimms,* 111 Ill.App.3d 751, 67 Ill. Dec. 313, 444 N.E.2d 549, 557–58 (1982); *Nicholson v. Evans,* 642 P.2d 727, 732 (Utah 1982).

In the present case, by their own admissions, the Individual Defendants, like the defendants in *Energy Resources, Production*

*Finishing,* and *Scholnick,* were specifically told that Ward and Iglar did not trust Knueppel and other Regal–Beloit personnel and, consequently, that the owners of Brad Foote would never sell their business to Regal–Beloit. Not only did Drecoll, Palmer and Rosmonowski fail to disclose this fact to Knueppel, Packard and/or other disinterested Regal–Beloit officers; but, indeed, Drecoll actively misled Regal–Beloit when he stated at the April 26, 1993 meeting that, in his opinion, Regal–Beloit's acquisition of Brad Foote was a good idea, that such an acquisition could be successfully accomplished by Regal–Beloit, and that he could handle the consolidation of the two companies' operations.[6]

As noted by Magistrate Judge Denlow, it was, and is, impossible to test the "unalterability" of Brad Foote's refusal to deal with Regal–Beloit in the absence of full disclosure by the Individual Defendants of all material facts. Perhaps Knueppel, upon learning of Ward's distrust, could have spoken with Ward and addressed or, at least, minimized Ward's concerns. Perhaps Regal–Beloit could have altered the terms of its proposal sufficiently to overcome Brad Foote's reservations—in essence, making the owners of Brad Foote an "offer they could not refuse." Perhaps Ward's and Iglar's desires quickly to sell their interests in Brad Foote and retire—desires born out of Ward's and Iglar's recent medical problems—would have, and will, overwhelm their disdain for Regal–Beloit. These are but three of many possibilities.[7]

---

**6.** Defendants themselves recognize and admit that neither Knueppel or Packard were, or could have been, aware of Ward's and Iglar's purported distrust of Regal–Beloit. Indeed, according to Defendants, Ward was always polite—although not particularly receptive—when speaking with Knueppel or responding to Knueppel's continued efforts to reopen negotiations. At no time did Ward ever specifically tell Knueppel or Packard that Brad Foote would never sell to Regal–Beloit and/or that Ward and Iglar did not trust Regal–Beloit management—not in the November 3, 1995 letter terminating negotiations, not in the various telephone calls between Ward and Knueppel in late–1995 and early–1996, and not in response to Knueppel's various written requests to resurrect the deal with Regal–Beloit. Thus, Brad Foote's contention that the public policy

favoring disclosure of a refusal-to-deal is not implicated where, as here, there has been a steadfast refusal by the third party—Brad Foote—to respond to offers is unpersuasive; even if Regal–Beloit was acutely aware that Brad Foote was not replying to purchase offers, Regal–Beloit could not, and did not, know of the reasons for Brad Foote's failure to reply. Only with this knowledge could Regal–Beloit truly "test" Brad Foote's refusal to deal.

**7.** The primary case cited by Defendants in support of their position, *Northwestern Terra Cotta Corp. v. Wilson,* 74 Ill.App.2d 38, 219 N.E.2d 860 (1966), is factually distinguishable from the present matter. In *Northwestern Terra Cotta,* a corporate director paid $7 per share for shares of his corporation's stock which his corporation

In short, the Individual Defendants' failure to disclose any and all facts relevant and material to Regal–Beloit's pursuit of Brad Foote—including Ward's and Iglar's refusal to deal with Regal–Beloit, Brad Foote's business concerns with Regal–Beloit's original purchase offer, and the Individual Defendants' desire and efforts to acquire Brad Foote on their own account—prior to exploiting that "corporate opportunity" likely constitutes a breach of their fiduciary duties of loyalty and good faith to Regal–Beloit. As correctly noted by Magistrate Judge Denlow:

> [I]f employees continue to receive substantial salaries and continue to take part in top-level management meetings, negotiations and strategy discussions, their employer is entitled to their undivided loyalty and their utmost good faith.

(Report p. 800.)

Brad Foote's and the Individual Defendants' assertion that Drecoll, Palmer and Rosmonowski did not divert Regal–Beloit's corporate opportunity but, instead, merely "prepared to compete" with Regal–Beloit when negotiating for the purchase of Brad Foote is factually incorrect and does not alter the Court's conclusion as to Regal–Beloit's likelihood of succeeding on the merits of its breach of fiduciary duty claim. While Defendants correctly note that employees not subject to a restrictive covenant may make arrangements to compete with their employer prior to the termination of their employment,

*Radiac Abrasives, Inc. v. Diamond Technology,* 177 Ill.App.3d 628, 126 Ill.Dec. 743, 532 N.E.2d 428, 434 (1988); *Dowell v. Bitner,* 273 Ill.App.3d 681, 210 Ill.Dec. 396, 652 N.E.2d 1372, 1379 (1995); *Voss Engineering, Inc. v. Voss Industries, Inc.,* 134 Ill.App.3d 632, 89 Ill.Dec. 711, 481 N.E.2d 63, 65–66 (1985), Defendants incorrectly identify the nature of Drecoll's, Palmer's and Rosmonowski's "competition" with Regal–Beloit—viewing that "competition" merely as Drecoll's, Palmer's and Rosmonowski's intended operation of Brad Foote. In reality, as accurately stated by Magistrate Judge Denlow, "Mr. Drecoll was in direct competition with his employer, Regal–Beloit Corporation, to purchase Brad Foote Gear Work's, Inc," (Report p. 781); Drecoll, along with Palmer and Rosmonowski, knew that Regal–Beloit remained interested in acquiring Brad Foote and, in direct conflict with that interest, made an offer to purchase Brad Foote on his own behalf. Hence, the Individual Defendants' conduct likely violated the principal that an agent (or employee) may not compete with his principal (or employer) concerning matters within the scope of his agency (or employment). *See Mullaney, Wells & Co. v. Savage,* 78 Ill.2d 534, 37 Ill.Dec. 572, 402 N.E.2d 574 (1980); *Radiac,* 126 Ill.Dec. 743, 532 N.E.2d at 434; *MQS Inspection v. Bielecki,* No. 91–C–500, —— F.Supp. —— [1995 WL 918084] (E.D.Wis. Sept. 30, 1995); Restatement (Second) of Agency § 393 (1958).[8]

---

had unsuccessfully sought to purchase for $5 per share. No breach of fiduciary duty was found because the court could find no support for the claim that the corporation was actually interested in acquiring the stock for the higher price paid by the director. In fact, the testimony presented established that the corporation's board of directors, after having been specifically notified that the shares could be bought for $7 per share, determined that $7 was too high and that they could not afford to pay it.

Here, as previously discussed, Regal–Beloit never lost interest in acquiring Brad Foote and, indeed, likely was willing to increase its offering price and/or modify its terms in order to make the deal happen. Unlike the corporation in *Northwestern Terra Cotta,* Regal–Beloit was financially able and willing to pursue the corporate opportunity and did not knowingly elect to forego the opportunity. Thus, *Northwestern Terra Cotta* is inapposite and does not compel the legal conclusion that the Individual Defendants were entitled to pursue Brad Foote for them-

selves, without first disclosing all material facts to Regal–Beloit.

**8.** Further, even if the Individual Defendants' conduct could be regarded merely as preparation for competition, that conduct was actionable to the extent that it directly conflicted with Regal–Beloit's interests—specifically, Regal–Beloit's interest in acquiring Brad Foote for itself:

> In the absence of an agreement to the contrary—and there is no evidence of any contractual limitations binding on these defendants—an agent is free to engage in competition with his principal after termination of his employment. Furthermore, he may plan and develop his competitive enterprise during the course of his agency provided the particular activity engaged in is not against the best interests of his principal. Protection of the principal's interest requires a full disclosure of acts undertaken in preparation for entering into competition.

*Standard Brands v. U.S. Partition & Packaging Corp.,* 199 F.Supp. 161, 171–72 (E.D.Wis.1961).

### 3. The Individual Defendants Likely are Liable for Misusing Regal–Beloit's Confidential Business Information

█ In addition to the proscriptions on employees from competing with their employers and usurping their employers' corporate opportunities, employees are also prohibited from taking "advantage of the knowledge acquired of [their] principal's business to make profit for [themselves] at [their] principal's expense." Mechem's Outlines of Agency § 148 (1901 ed.) (as quoted in *Production Finishing*, 405 N.W.2d at 174). In *Comedy Cottage v. Berk*, 145 Ill. App.3d 355, 99 Ill.Dec. 271, 495 N.E.2d 1006 (1986), for example, the court held the defendant, the vice president and general manager of the plaintiff-corporation, liable for breaching his fiduciary duties by misusing confidential information gained by the defendant in the course of his employment:

> Because of his confidential position, defendant had knowledge of the prior negotiations with the landlord, the prior month-to-month lease and the circumstances surrounding its determination. In particular, Berk was still general manager when he received notice of termination of the corporation's lease. Berk then used the knowledge gained as a result of his position with the corporation as an opportunity to resign and obtain a lease for himself without competition or disclosure. Even assuming arguendo that defendant did not begin competing for the lease until after his resignation, defendant remained bound by his fiduciary duty because his acquisition of the lease was based upon knowledge acquired during his employment. The fact that the information involved in this case does not rise to the level of a trade secret does not negate the existence of a fiduciary duty with respect to the transaction.

*Id.* 99 Ill.Dec. at 276–77, 495 N.E.2d at 1011–12.

█ Here, as aptly stated by the Magistrate Judge, "the analysis which was made by Regal–Beloit in its own consideration of the possible acquisition and the steps which it believed could enhance the profitability of Brad Foote in the event of a possible acquisition were discussed with at least Mr. Drecoll and other senior management of Regal–Beloit. That information was extremely sensitive and confidential and nonpublic, and it is the type of information that Mr. Drecoll should under no circumstances have used for his own purposes." (Report p. 789.) Indeed, Drecoll would never even have "had knowledge of this possible transaction but for his employment with Regal–Beloit." (Report p. 805.) Thus, there is a likelihood that Regal–Beloit will succeed on the merits of its claim that Drecoll, Palmer and Rosmonowski utilized confidential Regal–Beloit information for their own purposes in violation of their fiduciary duties of loyalty and confidentiality.[9]

### B. Regal–Beloit Will Suffer Irreparable and Noncompensable Injury in the Absence of Preliminary Injunctive Relief and the Balance Of Harms Weighs in Favor of Regal–Beloit

█ It is indisputable that Regal–Beloit will suffer substantial and irreparable injury if the Individual Defendants are permitted to proceed with their proposed purchase of Brad Foote. Initially, as noted by Magistrate Judge Denlow, the Individual Defendants' intended acquisition of Brad Foote is to be accomplished through the use of a secured bank loan—a loan whose terms Regal–Beloit understandably has no control over. Consequently, once the sale of Brad Foote to the Individual Defendants is consummated, liens will be placed on Brad Foote and its property by the Individual Defendants' lender. Assuming that Regal–Beloit eventually succeeds on its breach of fiduciary duty claims against the Individual Defendants, and assuming that a constructive trust is imposed on the Individual Defendants' interests in Brad Foote, Regal–Beloit will be forced to take possession of Brad Foote subject to the loan terms and conditions ob-

---

**9.** Regal–Beloit's claim for breach of fiduciary duty as a result of the Individual Defendants' misuse of confidential information is separate and distinct from Regal–Beloit's claim for misappropriation of trade secrets—a claim which the Court does not consider for purposes of the present matter.

tained by the Individual Defendants—terms which may be substantially less favorable than those which could be obtained by Regal–Beloit acting on its own.[10] Moreover, Regal–Beloit would be foreclosed from negotiating its own terms of sale—including terms relating to price, warranties, leases, and labor issues—if it were forced merely to succeed to the Individual Defendants' interest/s in Brad Foote, rather than being afforded the opportunity to acquire Brad Foote through its own efforts.

The irreparable injury to Regal–Beloit would be even greater, however, if Regal–Beloit were precluded from acquiring Brad Foote altogether by virtue of the Individual Defendants' purchase. As previously indicated, acquisition of Brad Foote would afford Regal–Beloit and Illinois Gear a unique competitive position, in that, a consolidation of Illinois Gear's and Brad Foote's operations purportedly will (1) afford Illinois Gear the majority market position for spiral beval gears over 30″; (2) provide Illinois Gear with a proprietary capability for induction hardening large course pitch gearing; and (3) result in significant economies with respect to Illinois Gear's manufacturing, marketing and purchasing functions. The potential value to Regal–Beloit of this enhanced market position, diminished competition, an increased efficiency cannot adequately be measured and/or quantified. Indeed, it would De difficult, if not impossible, to calculate with any degree of reasonable certainty the injury to Regal–Beloit—particularly the injury over time—from the Individual Defendants' usurpation of Regal–Beloit's opportunity to purchase Brad Foote.[11] As noted by Magistrate Judge Denlow:

[I]t would be very difficult to compute possible damages, and the damage computations would vary quite significantly whether you were looking at it from Regal–Beloit's standpoint or the profits which the individual defendants might have made. And the competitive position was a unique competitive position because of the products that Brad Foote Gear Work was manufacturing which would give Regal–Beloit a certain major percentage share with respect to certain products.

(Report p. 793–94.) Thus, Regal–Beloit has adequately demonstrated that (1) it will suffer irreparable harm if the requested injunction is not granted, and (2) it possesses, and will possess, no adequate remedy at law, as neither monetary damages nor the imposition of a constructive trust can adequately compensate Regal–Beloit for its potential loss. *Radiac*, 126 Ill.Dec. 743, 532 N.E.2d at 431.

■ The Court further finds that harm likely to be suffered by Regal–Beloit if the injunction is not issued is greater than the potential the harm to Drecoll, Palmer, Rosmonowski or Brad Foote if the injunction is issued improvidently. As correctly found by Magistrate Judge Denlow:

The defendants will only suffer a possible delay in the closing of this transaction. The evidence to this point is that the proposed loan and acquisition which is on the table by the defendants is a bankable loan, and the Court does not find a reason to believe that the loan will not be bankable and the transaction not viable at a later point in time.

(Report p. 795.)[12] This possible delay to the Individual Defendants does not compare to

---

10. Further, any attempt by this Court to "unwind" a potential financing arrangement between the Individual Defendants, a lender, and Brad Foote would be both extremely difficult—creating, in the Magistrate Judge's words, "tremendous headaches for all concerned" (Report p. 794)—and potentially unfair to the innocent third-party lender, who, at best, may well be deprived of the benefit of its bargain with the Individual Defendants and, at worst, may be forced to deal with unknown parties, accept unanticipated risks, and incur unplanned costs.

11. Merely equating Regal–Beloit's loss with the Individual Defendants' profits from Brad Foote

over time would be inadequate, as the Individual Defendants cannot capture the same market position or economies of scale from Brad Foote as can Regal–Beloit. Thus, the mere imposition of a constructive trust on the Individual Defendants' profits from Brad Foote would not sufficiently compensate Regal–Beloit for its injury.

12. The Individual Defendants' financing commitment expired on July 1, 1996. Thus, regardless of whether they are permitted to proceed with their proposed acquisition now or six months from now, Drecoll, Palmer and Rosmonowski will have to "start from scratch" in their attempts to obtain financing. Defendants contend

the injury likely to be visited upon Regal–Beloit if the Individual Defendants' transaction goes forward. Thus, the balance of the harms favors Regal–Beloit and counsels for the issuance of a preliminary injunction.[13]

### C. The Six–Month Preliminary Injunction Recommended by the Magistrate Judge is Both Fair and Appropriate

After concluding that Regal–Beloit had established the need for, and propriety of, preliminary injunctive relief, Magistrate Judge Denlow determined that the Individual Defendants should be enjoined "from closing their proposed purchase and sale of Brad Foote until the first to occur of two events, first, a full trial on the merits, or second, a period not to exceed six months from today." (Report p. 802.) The Magistrate Judge advocated the six-month limitation on the requested injunction for the following reasons:

> [T]he Court believes that the purpose of the injunction should be to provide a level playing field upon which the plaintiff, Regal–Beloit, can attempt to pursue the Brad Foote Gear Works acquisition. The defendants, Drecoll, Palmer and Rosmonowski, have a right to, at some point in time, pursue Brad Foote Gear Works.... They were not entitled to proceed with the negotiation and possible purchase during the time that they were employed by Regal–Beloit Corporation. The Court finds that there has been a six-month advantage provided to the three individuals by the period

of January through June 1996, during which point in time Regal–Beloit Corporation was not aware that they were in fact competing with their own employees for the possible purchase of Brad Foote Gear Works.

The imposition of a six-month injunction, maximum, protects the interests of all concerned. First, with respect to Regal–Beloit Corporation, it provides them with the opportunity to convince Brad Foote Gear Works that they are in fact the best suitor for the company and now provides them with the information which they had been denied, namely, that they are in a competitive bidding situation with their own former employees.

Second, because Mr. Drecoll, Mr. Palmer and Mr. Rosmonowski were not under any type of employment agreement or other restrictions, to grant an injunction for a period greater than six months would in effect be to grant the plaintiffs greater injunctive relief than they might be entitled to, because, as the Court notes, ... there is no covenant that bars them from going out and trying to buy a business, it is only because they breached their fiduciary duties in this case. And, therefore, to level the playing field, for the next six months, Regal–Beloit should now be able to proceed unhindered by their former employees to try to convince Brad Foote Gear

that, "The longer the Individual Defendants' acquisition of Brad Foote is delayed beyond July 1, 1996, the more uncertain the financing for that acquisition becomes." (Indiv. Def. Objections p. 7.) Yet, Defendants offer this Court no support, and no viable rationale for this contention; if the deal would be profitable now, it will presumably be profitable in six months.

**13.** Although Defendants assert that the requested injunctive relief is against the public interest, as the proposed injunction would injure Brad Foote, an innocent third-party, there is ample evidence to suggest that Brad Foote was not entirely "innocent" in its dealings with Regal–Beloit and the Individual Defendants. While Brad Foote unquestionably had the right to approach Drecoll to inquire as to his interest in changing employment, participating in an ESOP, or buying the company, *TAD, Inc. v. Siebert*, 63 Ill.App.3d 1001, 20 Ill.Dec. 754, 380 N.E.2d 963, 967 (1978), Brad Foote's contact with Drecoll

went far beyond a mere opening inquiry. Rather, Brad Foote engaged in discussions and/or negotiations with Drecoll for more than six months while Drecoll was still employed as a vice president and General Manager of Illinois Gear. During this six month period, Brad Foote received numerous letters and phone calls from Regal–Beloit indicating Regal–Beloit's continued interest in acquiring Brad Foote; yet, at no time, did Brad Foote ask the Individual Defendants to resign their positions at Regal–Beloit, inform Regal–Beloit of their negotiations with Regal–Beloit employees, or, significantly, notify Regal–Beloit of the Brad Foote owners' purported distrust for Regal–Beloit personnel and their resulting refusal to sell to Regal–Beloit. Thus, while it is unclear whether Brad Foote is subject to any legal liability for its conduct, Brad Foote was not truly an innocent third-party—it knew or should have known of the impropriety of the Individual Defendants' conduct and did nothing.

Works that they are the best game in town.

The Court also believes that such an injunction protects the owners of Brad Foote Gear Works because it puts them to the test of whether or not they would ever do a deal with Regal–Beloit Corporation. It puts them to the test of whether money talks. It gives the owners of Brad Foote Gear Works the option of either negotiating with Regal–Beloit, which they have every right to do, or of waiting the six-month period and hoping that the transaction contemplated by these three individuals is still on the table and that the loan commitment is still in effect.

(Report pp. 802–04.)

This Court concludes that the Magistrate Judge's reasoning is both sensible and sound. To enjoin Drecoll, Palmer and Rosmonowski from pursuing Brad Foote for more than six months—the length of the "head start" gained by the Individual Defendants through their breaches of fiduciary duty—would be to afford Regal–Beloit greater relief than it might otherwise be entitled to after a full trial on the merits. Further, as correctly noted by Magistrate Judge Denlow, a six-month injunction will return the parties to the position they presumably would have been in absence the Individual Defendants improper conduct—Regal-Beloit will be able to negotiate with Brad Foote with full knowledge of all material facts; Drecoll, Palmer and Rosmonowski will be able to pursue their potential deal with Brad Foote while not serving as agents/employees of their primary competition; and Brad Foote will be able to make a "true" decision as to whether Regal–Beloit's or the Individual Defendants' offers are more appealing and/or palatable.[14]

In simplest terms, injunctive relief should be fashioned in such a way as to put the parties back to where they would have been but for Defendants' alleged wrongdoing and to assure that no further damage is done. Brad Foote has a right to sell to whomever they choose, at the terms most acceptable to them; Regal–Beloit has a right to pursue its "corporate opportunity" with knowledge of all material information. It may be that Brad Foote, in fact, will refuse to sell to Regal–Beloit on any terms, but Regal–Beloit should have the unfettered opportunity to put Brad Foote's refusal "to the test."

Now that the Individual Defendants are no longer Regal–Beloit employees, and because they are not bound by any restrictive covenants, Drecoll, Palmer and Rosmonowski have the right to pursue Brad Foote for themselves, assuming Brad Foote refuses to strike a deal with Regal–Beloit. Yet, since the Individual Defendants' purported breach of fiduciary duty occurred over a six-month period, an equivalent period of time seems to be reasonable, and, indeed, required, to put Brad Foote's refusal-to-deal with Regal–Beloit "to the test."

Bear in mind that, at this time, the Court only addresses the matter of preliminary injunctive relief. The Court always encourages business people to make business decisions; and, in making such business decisions with respect to the present matter, the Court reminds *all* of the parties of the potential availability of money damages against the Individual Defendants and/or Brad Foote should liability be established.

### CONCLUSION

For the foregoing reasons, this Court accepts the recommendation of the Magistrate Judge and grants Plaintiff Regal–Beloit's

---

**14.** Defendants point to the statement allegedly made by Packard to the effect that Packard would force Drecoll to spend $200,000 in legal fees to support their assertion of an "unclean hands" defense. Yet, indicated by this Courts lengthy discussion, regardless of whether Regal–Beloit's legal claims are made out of anger, disappointment or a genuine desire for justice, those legal claims are well-grounded in the law and are likely to succeed on their merits. This Court is not willing to deprive Regal–Beloit of appropriate legal relief simply because one of its

officer's statements suggests that the relief is sought for personal, as well as for business, reasons.

Additionally, the Court need not, and does not, address Regal–Beloit's various objections pertaining to Magistrate Judge Denlow's various evidentiary rulings, as (1) these rulings are not included as part of the Magistrate Judge's Report and (2) immediate resolution of these evidentiary issues is unnecessary for the Court properly to consider and to rule upon the parties' substantive objections.

motion for a preliminary injunction. Defendants Drecoll, Palmer and Rosmonowski, along with their agents, servants, employees, attorneys and any other person/s in active concert or participation with them who receive actual notice of the preliminary injunction order, by personal service or otherwise, shall be restrained and enjoined from pursuing or closing the proposed purchase of Brad Foote Gear Works, Inc., its stock or its assets, until the earlier of (1) December 27, 1996, or (2) a final judgment on the merits of this case. Bond continues in the amount of $5 million.